**In the Interest of K.W.**

**No. 2–03–260–CV.**

Court of Appeals of Texas,
Fort Worth.

April 15, 2004.

Richard A. Gladstone, Fort Worth, for Appellant (Martha).

Marc F. Gault, Fort Worth, for Appellant (Charles).

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Sylvia Mandel, Cindy Williams, Asst. Criminal Dist. Atty's, Fort Worth, for State.

Owens & Owens, Kerry L. Owens, Arlington, Ad Litem.

Panel B: HOLMAN, GARDNER, and WALKER, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

This is a termination of parental rights appeal. Following a bench trial on August 25, 2003, the trial court terminated the parental rights of Appellant Martha T. to her four-year-old son, K.W. The trial court also terminated the parental rights of Appellant Charles W., K.W.'s alleged biologi-

cal father.[1] We affirm the trial court's judgment terminating the parental rights of Martha T. We reverse that portion of the trial court's judgment terminating the parental rights of Charles W., and we render judgment that the Texas Department of Protective and Regulatory Services (TDPRS)[2] take nothing on its claim seeking to terminate the alleged parental rights of Charles W. to his alleged son K.W. We remand this cause to the trial court for further proceedings consistent with the establishment of the parent-child relationship between Charles W. and the minor child K.W.

## BACKGROUND

Martha testified at trial. Charles was incarcerated in prison in New York and did not testify at trial; his court-appointed attorney was present on his behalf. Martha testified that she and Charles began a relationship in 1997 when they were both living in New York. When Martha told Charles that he was going to be a parent, he was happy. Charles was incarcerated in New York in November 1998. During her pregnancy, Martha was incarcerated for criminally negligent homicide, a charge for which she was later acquitted. Several months after she was acquitted of this charge, Martha gave birth to K.W. on February 13, 1999. At that time, Charles was still incarcerated and remained incarcerated at the time of this trial seeking to terminate his parental rights. Martha twice took K.W. to visit Charles in prison in New York.

Martha left New York in August 1999 and moved to Texas. She did not inform Charles that she was leaving the state of New York. In October 1999 she sent a few letters to Charles in prison in New York, but after one and one-half months she ceased writing to him. Over the next two and one-half years she had multiple residences, including family members' residences, a trailer house, numerous motel rooms, and the Arlington Night Shelter. To her knowledge, Charles had no idea where she and K.W. were residing after she ceased corresponding with him.

In June 2001, Martha met Byron Keith Herford while she was living in Ennis, Texas. In October 2001, Martha, K.W., and Herford moved to Fort Worth. He was a user of crack cocaine and Martha began smoking crack; Martha acknowledged that they were both drug users and there was not a specific place where she, Herford, and K.W. were living. Between October 2001 and February 2002, Martha left K.W. in the care of Herford. Martha started noticing marks and bruises on K.W., and when she told Herford she and K.W. might go to a women's shelter, he beat her up and told her that if she left she would be taken to jail because K.W. had bruises on him. One time she saw a mark or welt on K.W.'s buttocks that was five to six inches long, and another time she saw marks on K.W. that were scratch marks.

On February 24, 2002, Officer Brandy Albano responded to a report that a man was seen at a convenience store in Arlington leaning over a stroller and striking a child in the face. When Albano arrived at the store, she made contact with Martha, Herford, and K.W. Albano noticed a stench of urine coming from K.W. and the dirti-

---

1. To protect the privacy of the parties involved in this appeal, we identify the child by initials only and the appellants by first names only. *See* TEX. FAM.CODE ANN. § 109.002(d) (Vernon 2002).

2. Effective February 1, 2004, the name of the agency changed to the Texas Department of Family and Protective Services. However, for the sake of consistency in this case, we will continue to use TDPRS when we refer to the agency.

ness of his clothing. Albano removed a rag from K.W.'s head and saw several abrasions on his forehead that were open and fresh and oozing. Albano pulled up K.W.'s shirt sleeves and pants legs and noticed various marks that appeared to possibly be burns, as well as bruises on K.W.'s legs, back, buttocks, and shoulder. By the time Albano arrived at the hospital with K.W., a new injury had appeared on his jawline which had swelled up and turned purple. In Albano's opinion, these injuries were intentionally inflicted and were not consistent with normal childhood injuries.

Chris Oliver, an investigator for TDPRS, testified that on February 24, 2002 he met a police officer at Cook's Hospital and took photographs of K.W.'s injuries. He discussed K.W.'s injuries with the police officers and the doctors at the hospital. Based upon his investigation, it was his opinion that K.W.'s injuries were consistent with child abuse, and after K.W. was released from the hospital he was removed from Martha's care and placed in the protective environment of a foster home. Oliver went to the Arlington City Jail and discussed K.W.'s injuries with Martha, who said that Herford was abusive to her and to the child, she had concerns about Herford injuring K.W., and she had planned on leaving but Herford would not allow her to leave.

Officer Albano filed felony criminal charges of endangerment to a child against both Martha and Herford. On August 5, 2002, Martha pled guilty to the charge and received five years' probation. Her probation was revoked on July 7, 2003 and Martha was sentenced to eight months in the State Jail Division of the Texas Department of Criminal Justice. She was bench warranted back to Tarrant County for this trial involving the termination of her parental rights.

## BURDEN OF PROOF IN TERMINATION PROCEEDINGS

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex.2002).

■ In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM.CODE ANN. § 161.206(b) (Vernon Supp.2004); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re D.T.*, 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2000, pet. denied) (op. on reh'g).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (Vernon 2002); *Richardson v. Green*, 677 S.W.2d 497, 499 (Tex.1984); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex.App.-Waco 2002, pet. denied). Both elements must be established; termination may not be based

solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." TEX. FAM.CODE ANN. §§ 161.001, 161.206(a); *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *G.M.,* 596 S.W.2d at 847; *D.T.,* 34 S.W.3d at 630. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002).

## TRIAL COURT'S FINDINGS

Although requested, the trial court did not file findings of fact and conclusions of law. In its judgment,[3] the trial court found that both Martha and Charles: 1) knowingly placed or knowingly allowed K.W. to remain in conditions or surroundings which endangered K.W.'s physical or emotional well-being (section 161.001(1)(D)); 2) engaged in conduct or knowingly placed K.W. with persons who engaged in conduct which endangered his physical or emotional well-being (section 161.001(1)(E)); and 3) constructively abandoned K.W. (section 161.001(1)(N)). The

trial court also found that it is in K.W.'s best interest to terminate Appellants' parental rights (section 161.001(2)).[4]

## APPELLANTS' ISSUES ON APPEAL

Both Appellants challenge the legal and factual sufficiency of the evidence to support the trial court's findings that they violated either of the two statutory grounds for termination concerning endangering K.W. *See id.* § 161.001(1)(D), (E). They additionally challenge the legal and factual sufficiency of the evidence that they constructively abandoned K.W. who had been in the permanent or temporary managing conservatorship of TDPRS for not less than six months. *See id.* § 160.001(1)(N). Lastly, Charles asserts the trial court erred in denying his motion to stay the proceedings for a three-month period after which time he was scheduled to be released from prison in New York and could have attended a trial in this case in Texas.

## STANDARD OF REVIEW

In a trial to the court where no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Pharo v. Chambers County,* 922 S.W.2d 945, 948 (Tex.1996). Where a reporter's record is filed, however, these implied findings are not conclusive and an appellant may challenge them by raising both legal and factual sufficiency of the evidence issues. *Roberson v. Robinson,* 768 S.W.2d

---

**3.** The petition filed by TDPRS sought termination of Appellants' parental rights in K.W. as well as termination of Martha's parental rights in K.W.'s older brother, B.T. The trial court's judgment is titled "Order Of Termination As To [K.W.] Only" and refers only to K.W. Additionally, it is undisputed that the trial only dealt with K.W. However, the birth date that is recited in the trial court's judg-

ment as belonging to K.W. appears to actually belong to B.T. Further, the social security number that is listed in the judgment as belonging to K.W. is the same number that TDPRS listed in its petition as belonging to B.T.

**4.** TEX. FAM.CODE ANN. §§ 161.001(1)(D), (E), (N), 161.001(2) (Vernon 2002).

280, 281 (Tex.1989). Where such issues are raised, the applicable standard of review is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Id.*

The higher burden of proof in termination cases alters the appellate standard of legal sufficiency review. *J.F.C.*, 96 S.W.3d 256, 265 (Tex.2002). The traditional no-evidence standard does not adequately protect the parents' constitutional interests. *Id.* In reviewing the evidence for legal sufficiency in parental termination cases, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. *Id.* at 265–66. We must review all the evidence in the light most favorable to the finding and judgment. *Id.* at 266. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* However, we must consider undisputed evidence even if it does not support the finding. *Id.* If we determine that no reasonable factfinder could form a firm belief or conviction as to the truth of the allegations sought to be established, then the evidence is legally insufficient, and we must reverse and render. *Id.*

The higher burden of proof in termination cases also alters the appellate standard of factual sufficiency review. *In re C.H.*, 89 S.W.3d at 25. "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. *Id.* Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child. *Id.* at 28.

Because the facts of the situation are different for each Appellant, we will address their issues separately.

## TERMINATION OF MARTHA'S PARENTAL RIGHTS

The court found that Martha violated two provisions of the family code dealing with endangerment of a child, and that she constructively abandoned K.W. for at least a six-month period during which K.W. was in the conservatorship of TDPRS. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E), (N).

Martha admitted that the endangerment and constructive abandonment allegations were accurate. She testified that after returning to Texas she served time in the Tarrant County Jail for "a lot" of speeding tickets and for two misdemeanor convictions for possession of marijuana, to which she pled guilty on December 2, 1999 and November 10, 2000. She admitted that she knew that Herford was physically abusing K.W. and that she did nothing to extricate herself or K.W. from the abusive situation. She admitted that she pled guilty to the criminal endangerment charge concerning K.W. and was currently incarcerated in a state jail facility for this conviction. She testified that she pled guilty to the criminal charge of endangering K.W. because she believed she had endangered him when she did not leave her relationship with Herford. She admitted that she endangered K.W. by leaving him in Herford's care after she realized

that Herford was injuring K.W. She acknowledged she was a drug user during the time she was caring for K.W., that she smoked crack cocaine and marijuana, and that she did not have a permanent place for K.W. to live. She agreed that she had not been able to provide K.W. with a safe and stable home. Although she initially did not use drugs when she was released from jail and put on probation, she started using crack cocaine again in January 2003. Further, she agreed that she had constructively abandoned K.W. for at least a six-month period during which time K.W. was in the conservatorship of TDPRS.

Martha explained that she and K.W. remained with Herford because on several occasions he threatened to kill her if she said anything about K.W.'s injuries, and she felt trapped. She testified that she was trying to improve herself and that she got her GED when she was in the Tarrant County Jail. Martha acknowledged that she "was a drug addict, and I still fight that every day," but said that when she gets out of the state jail facility she wants to check herself into a treatment center. She loves K.W. and wants to see him after she is released from confinement.

The arresting officer and the investigator for TDPRS both testified that in their opinions the injuries exhibited by K.W. were intentionally inflicted, were consistent with child abuse, and were not consistent with normal childhood injuries.

■ On appeal, Martha asserts the evidence of endangerment is insufficient because the determination of whether K.W.'s injuries were accidental or intentionally inflicted requires scientific expertise, and neither the arresting officer nor the investigator for TDPRS were qualified under Rule 702 as experts. TEX.R. EVID. 702. Martha cites no cases in support of her theory that scientific evidence is required in order for the factfinder to determine

whether the endangerment allegations of section 161.001(1)(D) or (E) were proven at trial. We decline to hold that expert medical testimony is mandatory in a suit seeking to terminate parental rights under section 161.001(1)(D) or (E). We note that the witnesses' testimony was unobjected to by Martha at trial, and she herself testified that the evidence supported the two endangerment allegations. Additionally, she acknowledged pleading guilty to criminal endangerment because she was guilty of this offense.

Applying the appropriate standards of review, we find that there is legally and factually sufficient evidence to support termination of Martha's parental rights based upon the grounds listed in section 161.001(1)(D) and (E), that Martha knowingly placed or knowingly allowed K.W. to remain in conditions or surroundings which endangered his physical or emotional well-being, and that Martha knowingly engaged in conduct or knowingly placed K.W. with persons who engaged in conduct which endangered his physical or emotional well-being.

■ If multiple conduct grounds are alleged for termination, the evidence is factually sufficient if it supports just one of the alleged conduct grounds. *In re W.J.H.*, 111 S.W.3d 707, 715 (Tex.App.-Fort Worth 2003, pet. denied). Accordingly, we need not address whether the evidence is sufficient to establish termination pursuant to the constructive abandonment ground of section 161.001(1)(N). We overrule both of Martha's issues on appeal.

### TERMINATION OF CHARLES' PARENTAL RIGHTS

At the conclusion of the trial, the trial court stated:

Now as far as [Charles] is concerned, it would appear to me that his lack of

concern about the child, about whether he had a child, and he knew he had a child, and where it went, whether it needed to be supported, what happened to the child, indicates a complete and total lack of responsibility on his part, and again, as has been pointed out, he's never really acknowledged that it is his child as is set up under the law.

That being the case, I'm going to terminate whatever rights he might have had.

Charles was served with the termination petition in April 2002 while he was incarcerated in prison in New York. Charles' alleged parental rights were eventually terminated based upon: failure to file an admission of paternity (section 161.002(b)(1)); failure to register with the paternity registry and his whereabouts cannot be determined (section 161.002(b)(2)); endangering a child (section 161.001(D)-(E)); and constructive abandonment for at least a six-month period when a child is in the conservatorship of TDPRS (section 161.001(N)).[5]

▆▆▆ Charles raises legal and factual sufficiency challenges to each of these grounds for termination. When a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points or issues that would afford the party the greatest relief. *CMH Homes, Inc. v. Daenen,* 15 S.W.3d 97, 99 (Tex.2000); *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.,* 995 S.W.2d 675, 677 (Tex.1999). If disposition of one issue would result in a rendition, the court should consider that issue before addressing any issues that would only result in a remand. *Bradleys' Elec.,* 995 S.W.2d at 677. Accordingly, we first address Charles' legal sufficiency challenges.

---

5. TEX. FAM.CODE ANN. §§ 161.001(1)(D), (E),

### Section 161.002

TDPRS's petition requested the trial court terminate Charles' rights as the alleged father under section 161.002(b) of the family code which provides, in pertinent part:

(b) The rights of an alleged father may be terminated if:

(1) after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160;

(2) he has not registered with the paternity registry under Chapter 160, and after the exercise of due diligence by the petitioner:

(A) his identity and location are unknown; or

(B) his identity is known but he cannot be located.

TEX. FAM.CODE ANN. § 161.002(b).

### Did Charles file an admission of paternity?

▆▆▆ The trial court's judgment recites that Charles is the alleged biological father of K.W., and his alleged parental rights are terminated under section 161.002(b)(1) because after being served with citation he "did not respond [to this termination suit] by filing an admission of paternity or by filing a counterclaim for paternity or for voluntary paternity to be adjudicated under chapter 160 of the Texas Family Code before the final hearing in this suit."

Charles did not file a counterclaim for paternity or for voluntary paternity under chapter 160 of the family code. However, he maintains that he did file several admissions of paternity; therefore, the trial court erred in terminating his alleged parental rights under section 161.002(b)(1).

(N), 161.002(b)(1)-(2) (Vernon 2002).

In April 2002, Charles was in prison in New York where he was served with TDPRS's petition seeking to terminate his parental rights. In early May 2002, Charles wrote a letter to TDPRS that begins: "I Charles [W.] am the biological father of [K.W.]. I am writing you and the courts to inform you's [sic] that I am not giving up my parental rights." He then requested that K.W. be permitted to live with Charles' aunt in New York.

On May 9, 2002, the trial court filed a letter that Charles sent to the court coordinator. This letter recites: "I Charles [W.] am the biological father of [K.W.] age 3 born 2–13–99. In Erie County, City of Buffalo." Charles states that he is in prison in New York, he was completely unaware of his son's whereabouts or of any alleged abuse, he is deeply concerned about his son, and concludes by stating "Also I would like to inform all parties that in no way do I wish to abandoned [sic] my parental rights."

In a December 2, 2002 letter to the court, Charles states that "I would also like to subject to an paternity test no because I wanna prove that [K.W.] is my son cause I know he is but so that I can file for visitation and partial custody seeing that I am all the way in New York

state and my son is in Texas." On July 29, 2003, the court received a letter from Charles that stated "I am the biological father incarcerated" and "I pray that this court take into consideration of my letter, and allow me to have my child upon my release. No person in their right human mind would want their child taken away from them when the[y] are trying everything to prove themselves as a parent."

We find guidance in the case of *Estes v. Dallas County Child Welfare Unit of Texas Department of Human Services,* 773 S.W.2d 800 (Tex.App.-Dallas 1989, writ denied), which was decided under a former but very similar version of the family code. In *Estes,* the court of appeals construed the requirements of former family code section 15.023.[6] *Id.* at 801. The pertinent language of former section 15.023 is essentially identical to that of current section 161.002(b)(1).[7] Both sections specify that an alleged father's parental rights may be terminated if, after being served with citation, he "does not respond by timely filing an admission of paternity."[8] The Texas Department of Human Services took the position in *Estes* that an "admission of paternity" under section 15.023 must meet the stringent requirements of former sections 13.21–.22 of the family code dealing with a "statement of paternity."[9] *Estes,*

---

**6.** Act of May 27, 1987, 70th Leg., R.S., ch. 689, § 13, sec. 15.023, 1987 Tex. Gen. Laws 2550, 2550, *recodified by* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, sec. 161.002, 1995 Tex. Gen. Laws 113, 213 (current version at TEX. FAM.CODE ANN. § 161.002 (Vernon 2002)).

**7.** Section 15.023 dealt with involuntary termination of "the rights of an alleged or probable father with respect to an illegitimate child." These rights could be terminated if, after being served with citation, "the alleged or probable father does not respond by timely filing an admission of paternity or by filing a counterclaim for paternity or for voluntary legitimation." *See* n. 6. (emphasis added).

Current section 161.002(b)(1) eliminates the words "probable" and "illegitimate child." This section provides that the alleged father's rights may be terminated if, after being served with citation the alleged father "does not respond by timely filing an admission of paternity or a counterclaim for paternity." TEX. FAM. CODE ANN. § 161.002(b)(1) (emphasis added).

**8.** *See* n. 7.

**9.** Act of May 29, 1975, 64th Leg., R.S., ch. 476, § 24, secs. 13.21–.22, 1975 Tex. Gen. Laws 1261, 1263, *recodified by* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, secs. 160.201–.202, 1995 Tex. Gen. Laws 113, 211–12, *amended and recodified by* Act of May 22, 2001, 77th Leg., R.S., ch. 821, § 1.01, secs.

773 S.W.2d at 801–02. This is the same position that TDPRS makes in the instant case. The *Estes* court concluded that:

> [I]f the Texas Legislature had meant to require a statement of paternity under section 15.023, it would have used the words "statement of paternity" instead of "admission of paternity." Since the Legislature did not use those words, it follows that Estes did not have to satisfy the requirements of section 13.22 regarding statements of paternity.

773 S.W.2d at 802. Estes contended that his pro se answer alleging he "is an 'indigent parent'" was a specific admission of paternity sufficient to put the trial court and the Texas Department of Human Services on notice that he admitted his paternity and wanted to oppose termination of any rights he might have with respect to the child. *Id.* at 801–02. The court of appeals agreed and held the trial court erred in terminating any rights that Estes might have with respect to the minor child. *Id.* at 802.

TDPRS asserts that the *Estes* case was decided in 1989 under the former family code and therefore is not relevant. We disagree. As noted, except for the substitution of "acknowledgment of paternity" for "statement of paternity" in the voluntary legitimation statute and the requirement that the applicant must now state whether genetic testing has been performed, the former family code contained essentially the same requirements as the current family code regarding establishing parentage and termination of parental rights of alleged parents. *See* Tex. Fam. Code Ann. §§ 160.301–.302.

TDPRS argues that if we accept Charles' argument that his letters to the

trial court and to TDPRS constitute admissions of paternity under section 161.002(b)(1), this would "trump" the entirety of the Uniform Parentage Act; and render it useless. We do not agree. Chapter 160, the Uniform Parentage Act, sets out the mechanism by which parentage may be established. Chapter 161 sets out the mechanism by which a biological mother's or alleged biological father's parental rights may be terminated. We do not find the two chapters to be inconsistent or in conflict; each serves a separate and distinct purpose.

We hold that Charles' letters to TDPRS and to the court constitute admissions of paternity sufficient to put TDPRS and the trial court on notice that Charles admitted his paternity and wanted to oppose termination of any rights he might have with respect to K.W. *See Estes,* 773 S.W.2d at 802. The issue of whether Charles established his parentage was not before the trial court and is therefore not before this court.

Because we conclude that Charles' letters to TDPRS and to the court constitute admissions of paternity, we hold that there is no evidence to support the trial court's finding under section 161.002(b)(1) that Charles' alleged parental rights are terminated because he failed to file an admission of paternity.

### Did TDPRS know Charles' location?

██ The court found that TDPRS had met the requirements for termination listed in section 161.002(b)(2) because Charles had not registered with the paternity registry "and after the exercise of due diligence by the Department, his identity is known, but he cannot be located" and that

160.301–.302, 2001 Tex. Gen. Laws 1610, 1613 (current versions at Tex. Fam.Code Ann. § 160.301 (Vernon Supp.2004), § 160.302 (Vernon 2002)). (the former version used

"statement of paternity," whereas the current version, sections 160.301–.302, uses the term "acknowledgment of paternity.").

TDPRS "has exercised due diligence in attempting to identify, locate, and serve the alleged father." At trial, Charles' counsel acknowledged that Charles did not register with the paternity registery, but on appeal Charles argues that there is no evidence to support the court's finding that TDPRS used due diligence to locate him and that his location is unknown.

Our record does not contain the sworn affidavit that must be filed by TDPRS and reviewed by the trial court, in which TDPRS is required to describe its efforts to locate the alleged father. *See* Tex. Fam. Code Ann. § 161.002(e). However, we note that the trial court's judgment recites that Charles' last known address is: P.O. Box 1186, Moravia, N.Y. 13118. Additionally, Karolyn Adams, the TDPRS caseworker assigned to K.W.'s case, testified that she and Charles have "been corresponding ever since the beginning of this case. I had an address for him in jail and we corresponded as often as possible." Further, the court's file contains letters sent by Charles to the trial court on May 9, 2002, December 2, 2002, and July 29, 2003. All three letters reflect Charles' address at the prison in New York. Therefore, it is uncontroverted that TDPRS and the court were aware of Charles' exact address at the prison in New York at the time of the termination hearing and entry of the trial court's judgment. Accordingly, we conclude that Charles' alleged parental rights cannot be terminated based upon section 161.002(b)(2), because there is no evidence to support the trial court's finding that TDPRS used due diligence in attempting to locate Charles but was unable to determine his location.

### Sufficiency of endangerment findings

We next address the legal sufficiency of the evidence to support the trial court's findings that Charles: 1) knowingly placed or knowingly allowed K.W. to re-main in conditions or surroundings which endangered his physical or emotional well-being; or 2) engaged in conduct or knowingly placed K.W. with persons who engaged in conduct that endangered his physical or emotional well-being. *See* Tex. Fam.Code Ann. § 161.001(1)(D), (E). There must be evidence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct. *D.T.*, 34 S.W.3d at 634.

Charles was incarcerated in New York at the time of K.W.'s birth and remained incarcerated at the time of the termination trial. TDPRS's caseworker testified she began corresponding with Charles after he was served in this termination suit and that Charles said he knew Martha had moved to Texas, but he did not have any information on how to get in contact with her in Texas. The caseworker stated she continued to correspond with Charles and that he told her he was not aware of Martha's situation or of the abuse that was going on while he was incarcerated in New York.

Martha testified that Charles is K.W.'s father and that she did not tell him when she and K.W. moved from New York to Texas when K.W. was six months old. After she moved, she wrote to Charles and told him that she was living in Texas at the house of her older son's grandparents. Charles and Martha wrote several times, but after one and one-half months she ceased writing to him. She did not know if Charles continued to send her letters, but the older son's grandparents did not forward her any letters. She acknowledged that Charles knew she had previously smoked marijuana, but testified he did not know of her relationship with Herford or the instabilities in her life or of her use of drugs other than marijuana. She said that Charles did not know of her whereabouts in Texas after she ceased writing to

him, nor did he know of her relationship with Herford or that Herford was abusing her or K.W.

TDPRS introduced copies of two documents entitled "Certificate of Conviction— Imprisonment" from the county clerk in Buffalo, New York, reflecting that Charles had been convicted of the felony offenses of attempted burglary and attempted criminal possession of a controlled substance.

 In a suit to involuntarily terminate the rights of an imprisoned parent, mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child. *Boyd*, 727 S.W.2d at 533–34. However, if the evidence, including the imprisonment, shows a course of conduct that has the effect of endangering the physical or emotional well-being of the child, a finding of endangerment is supportable. *Id.* at 534.

Reviewing all the evidence in the light most favorable to the trial court's findings of endangerment, we find no evidence that Charles knew of Martha's living arrangements in Texas, her abuse situation with Herford or that he was abusing or endangering K.W., or that Martha was smoking crack cocaine. Charles initially had an address where he could write to Martha, but that address changed after one and one-half months and Martha never again contacted him. The first time he became aware of Martha's or K.W.'s abusive situation was when he was served with citation in this termination of parental rights suit.

Construing the evidence in the light most favorable to the trial court's judgment, we hold there is no evidence from which a factfinder could reasonably form a firm belief or conviction that Charles knowingly placed K.W. or knowingly allowed K.W. to remain in conditions or surroundings which endangered K.W.'s physical or emotional well-being. We fur-

ther hold there is no evidence that Charles engaged in conduct or knowingly placed K.W. with persons who engaged in conduct that endangered K.W.'s physical or emotional well-being. Accordingly, we conclude that Charles' parental rights cannot be terminated based upon section 161.001(1)(D) or (E) because there is no evidence to support the trial court's findings on these grounds.

### Sufficiency of finding of constructive abandonment

 Section 161.001(1)(N) provides that a person's parental rights may be terminated if he:

> (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services or an authorized agency for not less than six months, and:
>
>> (i) the department or authorized agency has made reasonable efforts to return the child to the parent;
>>
>> (ii) the parent has not regularly visited or maintained significant contact with the child; and
>>
>> (iii) the parent has demonstrated an inability to provide the child with a safe environment.

TEX. FAM.CODE ANN. § 161.001(1)(N).

The TDPRS caseworker acknowledged that the only problem with Charles being a possible placement for K.W. was Charles' incarceration in New York. Once Charles became aware of K.W.'s whereabouts and the alleged abusive situation K.W. had been placed in by Martha, he corresponded regularly with the caseworker to inquire about K.W.'s condition. He expressed a desire to become more involved in K.W.'s life. He requested that K.W. be placed with Charles' aunt, a licensed foster parent in New York, and at his request a

home study was conducted concerning such a possible placement. He also sent several letters to the court expressing his concerns and desires about his son and the pending lawsuit. Additionally, he sent the caseworker a letter addressed to his son.

Construing the evidence in the light most favorable to the trial court's judgment, we hold there is no evidence from which a factfinder could reasonably form a firm belief or conviction that Charles constructively abandoned K.W. while K.W. was in the care of TDPRS. Accordingly, we conclude that Charles' parental rights cannot be terminated based upon section 161.001(1)(N) because there is no evidence to support the trial court's finding on this ground.

CONCLUSION

We sustain Charles' first issue. Because of our disposition of this issue, it is unnecessary to address Charles' other issues. *See* TEX.R.APP. P. 47.1. We affirm the trial court's judgment terminating the parental rights of Martha T. We reverse that portion of the trial court's judgment terminating the parental rights of Charles W., and we render judgment that the Texas Department of Protective and Regulatory Services take nothing on its claim seeking to terminate the alleged parental rights of Charles W. to his alleged son K.W. We remand this cause to the trial court for further proceedings consistent with the establishment of the parent-child relationship between Charles W. and the minor child K.W.