

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00420-CV

IN THE INTEREST OF K.E.S., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1] ON REHEARING

----------

We have considered appellee Department of Family and Protective Services' (DFPS) motion for rehearing. We deny the motion but withdraw our July 12, 2012 opinion and substitute the following.

Appellants K.W. (Father) and G.S. (Mother) appeal the trial court's judgment terminating their parental rights to their child, "Kurt."[2] After a bench

---

[1]See Tex. R. App. P. 47.4.

[2]We use an alias for the child throughout this opinion. See Tex. R. App. P. 9.8(b)(2).

trial, the trial court found by clear and convincing evidence that Mother and Father had engaged in conduct or had knowingly placed Kurt with persons who had engaged in conduct which endangered Kurt's physical or emotional well-being; that they had knowingly placed or knowingly allowed Kurt to remain in conditions or surroundings which endangered his physical or emotional well-being; that Father failed to file an admission of paternity or register with the paternity registry; that Mother constructively abandoned Kurt; and that termination of Mother's and Father's parental rights is in Kurt's best interest. Father challenges the trial court's nonpaternity findings and the factual sufficiency of the evidence. Mother's court-appointed counsel has filed a motion to withdraw and an *Anders* brief in support stating that after diligently reviewing the record, he believes that any appeal by Mother would be frivolous. *See Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967). Although given notice and an opportunity to file a pro se brief, Mother did not do so. We affirm in part and reverse in part.

## Background Facts

Kurt was born in November 2010. DFPS received a report that he tested positive for cocaine at birth. DFPS took him into care upon discharge from the hospital. Mother admitted to the DFPS investigator that she had been using cocaine for over twenty years,[3] since she was sixteen years old, and had last

---

[3]Mother has two convictions for possession of cocaine from 2001 and two convictions for delivery of cocaine from 2002 and 2003.

2

used cocaine three days prior to Kurt's birth. She admitted that she had been using crack cocaine on a weekly basis throughout her pregnancy. She told the DFPS investigator that she had five other children, none of which were in her care. Mother had been prostituting herself at the time of Kurt's conception but she identified Father as Kurt's father.[4] Mother and Father met on a street corner where Father would hang out. Mother had no identifying information for Father besides his name.

DFPS investigator Marilin Jakubowske found Father in the Coffield Unit of the Texas Department of Criminal Justice, where he was incarcerated for felonious theft of a motor vehicle. Jakubowske recalled only one instance of communication with Father. After she closed her investigation, she also received a letter from him in which he acknowledged that he believed he was Kurt's father. Oneeka Chilton, a DFPS worker, sent Father a family service plan and Father responded. Father did not tell Chilton about his ability or inability to perform the services in jail, but he did ask about Kurt's well-being.

Chilton spoke to Mother in December 2010. Mother told Chilton that she had a pending criminal case for theft in Kansas in which she was awaiting sentencing. She told Chilton that she wanted to enter an inpatient drug treatment program when she returned from Kansas. After Mother got probation in Kansas in January 2011, Chilton gave Mother a service plan. Mother got "very upset

---

[4]Mother has three convictions for prostitution, one in 2006, one in 2009, and one in 2010.

about . . . some of the things in the family service plan," stating that "she does care for her child, she doesn't lack empathy, and things of that nature." After talking to her attorney, Mother agreed to the plan.

Based on her drug assessment, Mother was recommended to complete intensive outpatient treatment. Mother did not complete the treatment however, and in March 2011, told Chilton that she had been drinking and using drugs. In April 2011, Mother was arrested for violating her probation in Kansas. She was sent to an inpatient drug treatment program, which she completed in July 2011, and she returned to Texas.[5]

DFPS moved for termination as to both parents. After a trial to the bench, the trial court found that Mother had knowingly placed or knowingly allowed Kurt to remain in conditions or surroundings which endangered his well-being; had engaged in conduct or knowingly placed Kurt with persons who engaged in conduct which endangered his well-being; and had constructively abandoned Kurt. The trial court also found that Father had knowingly placed or knowingly allowed Kurt to remain in conditions or surroundings which endangered his well-being and had engaged in conduct or knowingly placed Kurt with persons who engaged in conduct which endangered his well-being. The trial court found that termination of both Mother's and Father's rights was in Kurt's best interest. The trial court also found that Father did not file an admission of paternity or register

_____

[5]Chilton testified that Mother attended visitation with Kurt before she went to Kansas but made no contact with Kurt after her return.

4

with the paternity registry. The trial court terminated Mother's and Father's parental rights to Kurt. Mother and Father appealed.

## Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727

5

S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

## Father's Appeal

**Paternity**

In his first three issues, Father challenges the trial court's findings that he did not file an admission of paternity or register with the paternity registry. Father also argues that these findings are immaterial because paternity was tried by consent.

Under the family code, the rights of an alleged father may be terminated if

> (1) after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160; [or]
>
> . . . .

6

(3) the child is under one year of age at the time the petition for termination of the parent-child relationship or for adoption is filed and he has not registered with the paternity registry under Chapter 160.

Tex. Fam. Code Ann. § 161.002 (West 2008). This court has held that there are no formalities that must be observed for an admission of paternity to be effective. *In re V.S.R.K.*, No. 02-08-00047-CV, 2009 WL 736751, at *4 (Tex. App.—Fort Worth Mar. 19, 2009, no pet.); *In re K.W.*, 138 S.W.3d 420 (Tex. App.—Fort Worth 2004, pet. denied). Termination statutes must be strictly construed in favor of the parent. *See In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

Both Father and the State cite to *K.W.* In *K.W.*, the father did not file a counterclaim for paternity or for voluntary paternity under chapter 160. 138 S.W.3d at 429. The father did write a number of letters to the State and to the trial court in which he acknowledged that he was the biological father of K.W. *Id.* In that case, we held that the father's letters "constitute[d] admissions of paternity sufficient to put [the State] and the trial court on notice that [the father] admitted his paternity and wanted to oppose termination of any rights he might have with respect to K.W." *Id.* at 430. Similarly, in *V.S.R.K.*, we held that the father, even though he repeatedly questioned his paternity throughout the case, admitted his paternity for purposes of section 161.002 by filing a general denial, filling out a request for appointed counsel in which he stated that he was the parent of the child, and requesting paternity testing. 2009 WL 736751, at *4–5.

7

In this case, Father did not file a counterclaim for paternity or for voluntary paternity under chapter 160. He did file a request for counsel, signing on a line above the words "Respondent Parent," but did not circle whether he was a parent or an alleged parent on a separate portion of the form. Chilton testified at trial that Father responded to a letter she wrote "acknowledging the fact that he believed that this was his child." Father completely cooperated when asked to take a paternity test, the results of which were offered by DFPS and admitted without objection by Father. Based on these actions, we hold that Father admitted paternity for the purposes of section 161.002(b)(1). *See V.S.R.K.*, 2009 WL 736751, at *4–5; *K.W.*, 138 S.W.3d at 430; *see also Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 105 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that although father did not file a document with the court, he "timely file[d] an admission of paternity" by appearing at trial, asserting that he was the child's father, and requesting that his rights not be terminated). Because Father has claimed paternity, he "stave[d] off summary termination of his rights and require[d] the Department to meet the high burden of proof found in section 161.001." *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.) (noting that subsection (a) of section 161.002 gives a father who has admitted paternity "the right to proceed to trial and require the state to prove by clear and convincing evidence that he engaged in one of the types of conduct listed in section 161.001(1) and that termination is in the best interest of his child"); *see also* Tex. Fam. Code Ann. § 161.002(a).

8

Further, because DFPS introduced evidence relevant to Father's paternity (such as his paternity test results which established Father's paternity of Kurt) without objection, the issue of paternity was tried by consent. *See Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex. 1993) (op. on reh'g). We sustain Father's first and second issue. Having sustained Father's first two issues, we do not need to address his third issue. *See* Tex. R. App. P. 47.1.

**Grounds for termination**

In Father's fourth and fifth issues, he argues that the evidence is legally and factually insufficient to support the trial court's findings that he knowingly placed or knowingly allowed Kurt to remain in conditions or surroundings which endangered his well-being and engaged in conduct or knowingly placed Kurt with persons who engaged in conduct which endangered his well-being.

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a

9

reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573. If we determine that no reasonable factfinder could form a firm belief or conviction that the grounds for termination were proven, then the evidence is legally insufficient, and we must generally render judgment for the parent. *J.F.C.*, 96 S.W.3d at 266; *see* Tex. R. App. P. 43.3.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D) or (E) of section 161.001(1). Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003,

10

no pet.).    Under section 161.001(1)(D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125.    Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.    *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ).    For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child.    See *id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being.    See *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Courts have repeatedly held that evidence of conduct prior to a father's knowledge of paternity is not properly considered under subsection (D).    *See In re M.D.S.*, 1 S.W.3d 190, 198 (Tex. App.—Amarillo 1999, no pet.); *Djeto v. Tex. Dep't of Protective & Regulatory Servs.*, 928 S.W.2d 96, 98 (Tex. App.—San Antonio 1996, no writ).    Father did not become aware of Kurt until after Kurt's birth in late 2010 while Father was incarcerated.[6]    By the time Father was aware

---

[6]The paternity test was not completed until April 2011.

11

of Kurt's existence, Kurt had already been removed by DFPS and placed in foster care. Therefore we cannot say that there is sufficient evidence that Father knowingly placed or knowingly allowed Kurt to remain in endangering conditions.

However, Father's conduct prior to his knowledge of paternity may be considered under subsection (E). *See M.D.S.*, 1 S.W.3d at 198. Under (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

As evidence of Father's endangering course of conduct, the State points to Father's long criminal history, especially his conviction for sexual assault, and Father's knowledge that Mother was engaging in prostitution. The State argues that Father could be terminated under subsection (E) because he "should have known any potential off-spring of [Mother and Father's] sexual conjugation would

12

be raised by Mother in an environment of illegal narcotics and household income earned through" prostitution. While Father admitted to knowing that Mother was engaging in prostitution at the time of Kurt's conception, there was no evidence that Father was aware that Mother was a present danger to their future child. *See In re D.J.*, 100 S.W.3d 658, 668–70 (Tex. App.—Dallas 2003, no pet.) (holding that mother's knowledge that father had a criminal history of selling drugs and a recent history of doing drugs alone did not constitute clear and convincing evidence that leaving her child with father was endangering to the child). The State's argument assumes that subsection (E)'s language that prohibits "knowingly plac[ing]" a child with endangering people includes engaging in sexual intercourse with the knowledge that the sexual partner would be an unfit parent should the union result in pregnancy. To construe subsection (E) as the State would have us do would impose upon every man who engages in sexual conduct, protected and unprotected, with a woman, the duty to determine prior to the act that she would not engage in conduct in the future that could endanger any child they conceived. We do not read anything in subsection (E)'s language that indicates that knowingly placing a child with endangering people encompasses children who are not yet born or even contemplated. Thus, there is insufficient evidence to support a finding that Father knowingly placed Kurt with persons who engaged in endangering conduct.

Turning to whether Father himself engaged in conduct that endangered Kurt, we first note Father's extensive criminal history. Father was convicted of

13

attempted possession of cocaine in 1995, delivery of cocaine in 1996, 1997, and 1998, and possession of cocaine in 2001. Father has a conviction for evading arrest from 2003, theft of a vehicle from 2005, and failure to comply with sexual offender registration requirements and for delivery of cocaine in 2006. In 2010, Father was convicted for theft of a vehicle.

Father initially received deferred adjudication probation for the sexual assault offense but he was convicted of sexual assault of a child in 1990 when his probation was revoked. The offense occurred in 1985, when Father "had just turned" seventeen and his victim was fifteen "and a half." Father testified that he and the victim were boyfriend and girlfriend, but that her parents "didn't agree with it." Since statutory changes in 1997, Father has had to register as a sex offender.

During his last incarceration, Father was disciplined a number of times. In July 2011, Father threatened an officer in the dining hall. He was also caught possessing tattooing paraphernalia in July 2011. In August 2011, Father was found to have committed two offenses in jail by publically masturbating. Father only admitted to committing one offense. The disciplinary report for the other offense states that Father believed the officer wrote up the wrong cell number. On the offense report, the officer herself identified the offender by a different name.

While evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of

conduct that endangered a child's well-being, *J.T.G.*, 121 S.W.3d at 133, there is little evidence in this case that Father has continued this course of conduct since learning of the birth of his child.[7] And while Father's criminal past is lengthy and has resulted in numerous periods of incarceration, imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child. *Boyd*, 727 S.W.2d at 533–34; *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.). Imprisonment is only a factor to be considered. *Boyd*, 727 S.W.2d at 533–34; s*ee In re E.S.S.*, 131 S.W.3d 632, 639 (Tex. App.—Fort Worth 2004, no pet.) (holding that father's life sentence for murder, without more, was insufficient to support termination under subsection (E)). "Further, the commission of any intentional act which results in imprisonment, including violation of probation, is not sufficient grounds, standing alone, for termination." *In re T.H.*, 131 S.W.3d 598, 604 (Tex. App.—Texarkana 2004, pet. denied).

Father's sexual assault occurred when Father was a juvenile, and there is no evidence that he has engaged in any other violent sexual conduct or domestic violence in the twenty-six years since that crime. Father testified that he has not used drugs since 1989, but he did admit that he had sold drugs. While the trial court could have chosen to disbelieve this testimony, under a factual sufficiency review we must consider the entire record, and the State did not present any

---

[7]We are mindful that some of the misconduct allegations were alleged to have occurred after Father became aware that he was Kurt's father.

evidence to contradict Father's statements. *In re A.S.*, 261 S.W.3d 76, 87 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding that mother's uncontroverted testimony that she used marijuana once during her pregnancy did not rise to a conscious course of conduct). Further, Father's last conviction for delivery of cocaine was in 2006, and the State offered no evidence or argument that Father had sold illegal drugs in the five years between that conviction and this trial.

At trial, Father testified that as soon as he was notified that he might have a son, he immediately agreed to a paternity test.[8] DFPS investigator Jakubowske testified that she believed Father was trying to cooperate with DFPS for the return of his child. Chilton testified that she looked on the website for Father's prison unit and saw that it provides substances abuse education, parent training, life skills training, and counseling that Father could attend. Father testified that as soon as he got his service plan, he signed up on the waiting list for parenting classes. He said that because of budget cuts, parenting classes had been cut back, and he was told that he would probably be out of prison by the time his name came up on the list. Father was also on the waiting list for drug and alcohol classes. He also testified that his unit did not offer life skills classes, but it did offer "changes in cognitive intervention," a 180-hour class that Father completed in April 2011, six months before trial. The cognitive

---

[8]Kurt is Father's only biological child.

16

intervention class includes some life skills and relapse prevention instruction. Father described the program as "one of the best programs they have in TDC, because it deals with your thinking." Chilton testified that such a program "would help" Father meet his goals. Chilton testified that she believed that Father would also need parenting classes and substance abuse education. Chilton testified that she did not believe that Father has demonstrated that he can meet Kurt's emotional and physical needs, that he can protect Kurt from danger, or that he can provide a safe and stable home environment for Kurt.

Father testified that he has applied to "six or seven" truck driving schools to train as a truck driver. He did not think that his sexual assault conviction would prevent him from getting a job as a driver because he knew others with sexual assault convictions who drove trucks. He plans on living with his sister in Arlington. He said, "[W]hen I was out there on my own, I didn't have no responsibility. Now I have responsibility. You know, I don't mind doing whatever they want me to do, parenting class, whatever class they want me to do." He acknowledged that his long criminal history "is bad," but he believed that he could be a good father. Father asked that managing conservatorship be granted to his brother.

Chilton testified that DFPS hoped to place Kurt with Father's brother, who had expressed willingness to care for Kurt. Father's brother was scheduled for a home study the day after trial. Chilton testified that she believed that, if approved, Father's brother could be a good placement for Kurt. If Father's

17

brother was not a suitable arrangement, DFPS planned on placing Kurt for adoption.

Although Father did not complete his service plan, the record indicates that he made efforts to comply by signing up for the limited classes available to him in prison. *See In re J.A.J.*, 225 S.W.3d 621, 627 (Tex. App.—Houston [14th Dist.] 2006), *aff'd in part, rev'd in part on other grounds*, 243 S.W.3d 611 (Tex. 2007) (holding that mother's failure to complete her service plan was insufficient to support termination under subsection (D) when the evidence was that she attempted to improve her situation despite her poverty and lack of transportation). While Father has repeatedly and decidedly exercised poor judgment in his life, there is little evidence that he consciously continued such behavior since the birth of his only child. *See Williams v. Tex. Dep't of Human Servs.*, 788 S.W.2d 922, 927 (Tex. App.—Houston [1st Dist.] 1990, no writ) (holding that mother's poor treatment of her child in the two months in which she had custody of him was insufficient to support a finding under subsection (D) or (E) when three years had passed and she had not engaged in any endangering conduct since), *overruled on other grounds by In re J.N.R.*, 982 S.W.2d 137 (Tex. App.—Houston [1st Dist.] 1998, no pet.). Further, this case is distinguishable from cases relied upon by the State because when Father engaged in his criminal conduct amassed in his criminal record, he had no children that he was disregarding. *See T.H.*, 131 S.W.3d at 604 (holding that the evidence was insufficient to support termination under subsection (E) even when father was

18

incarcerated before the child was a year old and two years later was incarcerated for four years for burglary).

Father has been continually incarcerated since before Kurt's birth and had no knowledge that the child had been conceived or born prior to the letter sent by DFPS. Since receiving that information, Father cooperated with DFPS to the best of his ability. He signed up for all the classes available and completed the one in which he was able to enroll. He has searched for employment and made plans for improving his life upon his release. Father's request was simply that he be given a real opportunity when released from incarceration to do what was required to demonstrate his willingness and ability to be a good parent. [9]

Reviewing all the evidence in the light most favorable to the finding, we hold that no reasonable factfinder could form a firm belief or conviction that Father engaged in behavior endangering to Kurt. Neither could a reasonable factfinder, in reviewing the entire record, form a firm conviction or belief that Father violated subsection (D) or (E). The evidence thus is legally and factually insufficient to support termination under both subsections (D) and (E) of section 161.001(1). We sustain Father's fourth and fifth issues.

### Mother's Appeal

Mother's court-appointed appellate counsel has filed a motion to withdraw as counsel and a brief in support of that motion. In the motion, counsel avers

---

[9]Father's projected release date at trial was June 19, 2012.

19

that he has conducted a professional evaluation of the record and, after a thorough review of the applicable law, has reached the conclusion that there are no arguable grounds to be advanced to support an appeal of this cause and that the appeal is frivolous.

Counsel's brief and motion meet the requirements of *Anders* by presenting a professional evaluation of the record demonstrating why there are no reversible grounds on appeal and referencing any grounds that might arguably support the appeal. *See Anders*, 386 U.S. at 741, 87 S. Ct. at 1398; *Mays v. State*, 904 S.W.2d 920, 922–23 (Tex. App.—Fort Worth 1995, no pet.). This court has previously held that *Anders* procedures apply in parental rights termination cases when the Department has moved for termination. *In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.). Mother was given the opportunity to file a pro se brief on her own behalf, but she did not do so. The Department replied to Mother's counsel's *Anders* brief, agreeing that its independent review of the record revealed no colorable claims of error that would support reversing the trial court's judgment.

In our duties as a reviewing court, we must conduct an independent evaluation of the record to determine whether counsel is correct in determining that the appeal is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *Mays*, 904 S.W.2d at 923. Only then may we grant counsel's motion to withdraw. *See Penson v. Ohio*, 488 U.S. 75, 82–83, 109 S. Ct. 346, 351 (1988). We have carefully reviewed the appellate record and Mother's

20

appellate counsel's brief.    We agree with her appellate counsel that the appeal is wholly frivolous and without merit.    We find nothing in the record that might arguably support the appeal.    *See In re J.T.*, No. 02-10-00284, 2011 WL 856927, at *1 (Tex. App.—Fort Worth, Mar. 10, 2011, no pet.) (citing *Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005)).    Therefore, we grant Mother's appellate counsel's motion to withdraw and affirm the trial court's judgment terminating Mother's parental rights to her child.

## Conclusion

Having granted the motion to withdraw by Mother's counsel, we affirm that part of the trial court's judgment terminating Mother's parental rights to Kurt. Having sustained Father's first, second, fourth, and fifth issues, we reverse that part of the trial court's judgment terminating Father's parental rights to Kurt and render judgment denying the State's petition to terminate Father's parental rights to Kurt.  *See* Tex. R. App. P. 43.3; *J.F.C.*, 96 S.W.3d at 266 (stating that if we determine that the evidence is legally insufficient, we must generally render judgment for the parent).    Because we reversed the termination of Father's parental rights, we also reverse the trial court's appointment of DFPS as the child's permanent sole managing conservator.  *See In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008); *In re M.G.P.*, No. 02-11-00038-CV, 2011 WL 6415168, at *14 (Tex. App.—Fort Worth Dec. 22, 2011, pet. filed) (reversing the trial court's appointment of DFPS as the permanent managing conservator when it was appointed as a consequence of termination).    We remand the case to the trial

court for the limited purpose of appointing a permanent managing conservator.

*M.G.P.*, 2011 WL 6415168, at *14.

LEE GABRIEL
JUSTICE

PANEL:  WALKER, MCCOY, and GABRIEL, JJ.

DELIVERED:  September 20, 2012