COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                      NO.
2-06-00031-CV

 

 

IN THE
INTEREST OF 

E.A.W.S., A CHILD                                                                              

 

 

                                              ------------

 

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








This is an appeal from the termination of
parental rights to E.A.W.S.,[2]
a child.  Appellant Robin, the mother,
complains in nine points that the trial court abused its discretion in denying
her motion for continuance and that the evidence is legally and factually
insufficient to support the termination of her parental rights.

Appellant David, the father, asserts in three
points that there was insufficient evidence to support the trial court=s
finding that the Texas Department of Family and Protective Services (AState@) made
reasonable efforts to return E.A.W.S. to him, or that he failed to respond by
filing an admission of paternity.  He
also complains that to the extent his appeal is unduly restricted, section 263.405(i)
of the Texas Family Code violates his due process rights under the United
States and Texas Constitutions.

We affirm as to Robin.  We reverse the trial court=s
judgment terminating David=s
parental rights to E.A.W.S. and render judgment in his favor.

FACTUAL BACKGROUND








E.A.W.S. was born on January 17, 2005.  Robin took an overdose of Ambien, a hypnotic
amnesiac that can cause memory loss,[3]
three days before she was due to deliver E.A.W.S.  The actual number of Ambien pills that Robin
took is disputed, ranging from four to ten. 
Robin testified that she did not recall how many she had taken.  Victoria, E.A.W.S.=s
paternal aunt, who seeks to adopt the child,[4]
did not know exactly how many pills Robin took, but she asked Robin=s family
to take Robin to the hospital to induce vomiting.  It is disputed whether Robin was only
supposed to take one pill every twenty‑four hours, or two, but she failed
to follow either of these instructions. 
Her grandmother testified that Robin took two Ambien after filling the
prescription and two more later the same day. 
She testified that the next day, Robin took two more in the morning
before taking an overdose that afternoon. 
The CPS caseworker, Christy Stewart, testified that Robin said she took
ten Ambien pills.      After a charcoal
lavage was administered to Robin to induce vomiting and her obstetrician was
called, labor was induced.  It does not
appear that the Ambien overdose harmed E.A.W.S.








When informed that E.A.W.S. would be removed from
her, Robin told  Stewart that she had
tried to kill herself, but not the baby, with the Ambien, and that her plan had
been for her family to get her to the hospital in time to save the baby but not
herself.  This was not Robin=s first
mention of suicide.  She testified, AI was
put in a place for two weeks when I was fifteen years old for trying to kill
myself.@  Robin told Brenda Brooks, the CPS supervisor
who investigated Robin in 1999, that she had tried to commit suicide once when
she was fourteen or fifteen by taking a bottle of sleeping pills.

After E.A.W.S.=s birth,
Victoria and Roy tried to help Robin find a job and a place to live.  This was a challenge because of Robin=s prior
felony conviction for injury to a child. 
When Robin did work, she neglected her medications. Victoria testified
that when Robin neglects her medications, she becomes aggressive, extremely
agitated, and has problems concentrating and remembering things.  Robin started keeping odd hours and bad
company,[5]
which worried Victoria.  Then Robin quit
her job because of some conflicts with scheduling and with a coworker, and
remained out of work for another six to eight weeks.  Victoria testified that while Robin lived
with her, Robin made comments to her about some of the CPS workers,[6]
that she would Alike to kill them, put a bullet
through their brain.@








Robin moved out of Victoria=s house
so that E.A.W.S. could live there.[7]
After moving into an apartment subsidized by her church, Robin continued to
suffer from depression and suicidal ideation. 
She received prescriptions to treat depression first through Tarrant
County MHMR and later through Ellis County=s mental
health service, ADAPT.  Victoria
testified that acquiring E.A.W.S. had become an obsession to Robin developing
from the fact A[t]hat E.A.W.S. was taken away
from her and that she=s been told that she can=t have
her back.@   The removal of E.A.W.S. at the hospital was not Robin=s first
encounter with the State.  She has three
other children:  B.A.S., the oldest
child, born on December 22, 1994, lives with Robin=s
grandmother, who is his primary caregiver.[8]  Robin=s other
two children are N.C.D., born June 5, 1997, and T.A.D., born December 5, 1998;
they live with their father.













In February 2001, Robin was sentenced to three
years=
confinement after pleading nolo contendere to injury to a child, a felony.[9]  She was charged with that offense because of
injuries suffered by T.A.D., who was discovered to have twelve fractures in
various stages of healing at around six weeks old.[10]  At the hospital, when the CPS caseworker told
Robin about the fractures, Robin cursed and screamed until she was allowed to
speak to the doctor.  This volatile
behavior was not unusual for Robin, who has suffered from extreme mood swings
and has been diagnosed bipolar, with severe depression.  There was contradictory testimony at the
termination trial regarding abuse Robin herself may have suffered as a child.[11]  Before the Ambien overdose, on the same day,
an argument with her grandmother escalated to the point that Robin called the
police.[12]








While on parole, Robin met David at an Alcoholics
Anonymous/Narcotics Anonymous meeting. 
David had recently been released from prison and was also on
parole.  During her parole, Robin was
sent back to prison, once for removing her electronic monitor and once for
violating her parole conditions.[13]  While Robin completed her prison term, David
transferred to Missouri.  Upon her
release, she followed him there.  Robin
testified that their relationship was mostly good, except for one incident of
domestic violence, when he called her Aevery
name in the book,@ she slapped him, and he Athrew
[her] up against the wall, and threatened to crush [her] skull.@  Robin returned to Texas pregnant with
E.A.W.S.  David did not return to Texas
and was not around Robin or E.A.W.S. after E.A.W.S.=s birth.








CPS worker Stewart testified that she gathered
information on how to contact David after E.A.W.S. was born.  She made contact with him by telephone on
January 21, 2005 to discuss E.A.W.S.=s
removal from Robin.  She testified that
at that time, he indicated to her that he was going to speak with his parole
officer and see if he could come to the hearing to ask the judge to release the
baby to him.[14]  David asked that E.A.W.S. be placed with him
because he did not believe that E.A.W.S. was safe with Robin and he did not
want E.A.W.S. in foster care.  Stewart
testified that CPS did not do a home study on him, but did gather information
to start one.  A certificate of paternity
registry search conducted on November 1, 2005, shows that David had not filed a
notice of intent to claim paternity for E.A.W.S.[15]

Victoria, David=s
sister, testified that she had been in contact with David throughout the course
of the case.[16]  She also stated that he was aware of and
supported her plan to adopt E.A.W.S., that he was not at the point in his life
where he could safely parent a child, and that the court should terminate his
rights.[17]  Joyce Quam, the CASA worker on the case,
testified that she had spoken with David by phone about the plan for
termination of his parental rights.  She
testified that he told her that he would like E.A.W.S. to be adopted by
Victoria and her spouse.  Campbell, the
CPS supervisor on the case, recommended termination of any rights David might
have and testified that it was her understanding that David was in agreement
with that plan.








The State filed its original petition on January
20, 2005.  Termination of both Robin=s and
David=s
parental rights was listed in the original pleadings. Trial was originally set
for December 8, 2005, announced at the July 21, 2005 permanency hearing, at
which time the State also announced that it would not be seeking termination of
parental rights, but would instead seek to place managing conservatorship with
a relative.

At the November 10, 2005 permanency hearing, the
State announced that it would seek termination of parental rights at trial,
rather than permanent placement with relatives.[18]  The termination trial date was rescheduled at
the November hearing for March 14, 2006. 
However, the date for dismissal of the suit, under section 263.306(11)
of the Texas Family Code, was January 23, 2006. 
On December 2, 2005, Robin=s
attorney received an e-mail notification that the termination trial was
rescheduled for December 15, 2005.








Robin filed a motion for continuance on December
8, 2005.  At the hearing on the motion
for continuance, on December 12, 2005, Robin=s
attorney acknowledged that he had received the requisite forty-five days= notice
of the first trial setting and that termination was listed in the pleadings but
asserted that he had inadequate time to prepare for a termination trial and to
conduct discovery on the termination issues.[19]  He claimed that he did not have reasonable
notice given the State=s change in plan from permanent
placement to termination.  Finding that
it was in E.A.W.S.=s best interest to bring a final
resolution to the case, the trial judge denied the motion.








At the time of the termination trial, E.A.W.S.
was living with Victoria, who testified about her concerns with regard to Robin=s
emotional stability and safety and financial ability to provide for E.A.W.S.[20]  Robin had refused to take some of her
medication[21]
and had failed to take the rest with regularity.  When not medicated, she became aggressive,
had extreme mood swings, and was easily agitated.  She failed to attend the counseling set up by
CPS and a CPS drug assessment.  At trial,
several witnesses testified that Robin=s
behavior had not improved despite classes, therapy, counseling, and
medication.  Robin testified that she did
pay for and take some parenting and stress management classes on her own;
however, she admitted that she was still unable to take care of her children
and that she had been so frustrated by E.A.W.S.=s
removal from her that she had had memory problems, Ato where
I=ve had
to stop on the side of the highway to remember how to get to visitation
sometimes.@








At the time of trial, Robin had been interacting
with her son B.A.S. at her grandmother=s house.[22]  N.C.D. and T.A.D.=s
paternal grandmother testified that it was not Robin=s fault
that Robin had not visited N.C.D. and T.A.D. in the last year or so since
E.A.W.S. was born, because of N.C.D.=s mental
problems, in the form of a reactive attachment disorder to his mother.[23]  Robin testified that she has learned from her
mistakes and that she is proud of the person she is today.[24]

Robin was the only person listed to receive
services on CPS=s service plans of March 1, 2005[25]
and July 19, 2005.[26]  David was given notice of each judicial
review held in the case.  He testified
during the hearing on his motion for new trial that he had received actual
notice of the final hearing through his family and that he had seen a petition
that concerned Robin, seeking to terminate her parental rights, but he also
said that Aevery time that I=ve
spoken with CPS and family members, this entire proceedings has been pertaining
to Robin and not me.@ 
The original and amended petitions each included a clause to terminate
David=s
parental rights.








On December 15, 2005, the date of the final
hearing, a bench trial, the trial court noted that David had been served with a
copy of the original petition.  Prior to
the opening of testimony, the court filed a typewritten, signed, witnessed, and
notarized affidavit from David.  The
affidavit bore David=s name and address at the top,
followed by the case style and cause number,[27]
and stated at the beginning, ACOMES
NOW, David [L.W.], >hereinafter referred to as to
me, my, or respondent father=, and
submits this affidavit in the matter of parental rights in the above entitled
and numbered cause.@

The envelope containing the affidavit was
addressed to Victoria, and it had been handed to the assistant district
attorney that morning.  The affidavit
itself was directed to the ATARRANT
COUNTY OFFICE OF THE CRIMINAL DISTRICT ATTORNEY,@[28] but
addressed Athis Honorable Court@ in
several sections.  The record reflects
the confusion generated by the affidavit at the time.  The assistant district attorney presented it
to the court, stating,

I=m not
sure if I would call it an answer or a statement that he=s typed
up and prepared, and I=ve showed it to the attorneys to
let them know I=ve received this, signed by him
and notarized with the cause number and everything.  I guess that=s his
own statement to the Court. 








When asked by the court if she wanted to file it, she replied, AI=m not
sure what else to do with it.@[29]  The court then remarked, AI guess
if it has the cause number on the top, I assume he=s
attempting to answer this cause,@ and
reflected that it was Asomewhat unusual.@  No one objected to the affidavit being filed,
so the trial judge did so, stating, AI=ll file
it right now.  I can file it.  I=ll note
the time it was filed.@[30]








The affidavit indicated first that David, ARespondent
Father in this cause,@ was unable to attend the
hearing in person because he was living in another state.  However, because he was Acognizant
of the fact that he ha[d] legal rights at stake in this matter,@ he
sought appointment of legal counsel to protect his rights.[31]  In the second section, marked AII.
PARENTAL RIGHTS,@ the affidavit also indicated
that David had spoken to E.A.W.S.=s child
advocate concerning E.A.W.S.=s best
interests, that he had been asked by the advocate to Awillingly
relinquish@ his parental rights to E.A.W.S.,
and that he would transfer those rights only on the condition that his sister
Victoria and her husband be named the adoptive parents.  Specifically, in the second paragraph of
section II, he states: ABE IT KNOWN TO ALL PARTIES
CONCERNED IN THE MATTER OF [E.A.W.S.], Cause No. 323-79632J-05, I, David
[L.W.], Respondent Father, do, and will >TRANSFER= my
parental rights with the sole exception that the adoptive parents are named Roy
and Victoria.@[32]  It concluded with the following statement:

In closing, I willingly ATRANSFER@ my parental rights in
this matter with the stipulation that ROY, AND VICTORIA BE GRANTED FULL AND
PERMANENT CUSTODY OF [E.A.W.S.], IN THE EVENT ROY AND VICTORIA ARE NOT GRANTED
CUSTODY, THEN I FULLY RESCIND, AND RENDER THIS DOCUMENT NULL AND VOID.

 

The trial ended January 3, 2006; the order
terminating both Robin=s and David=s
parental rights[33]
was signed January 11, 2005.  The
Department of Family and Protective Services was appointed E.A.W.S.=s
permanent managing conservator, authorizing it to place her for adoption in a
suitable home.  Roy and Victoria were
appointed E.A.W.S.=s possessory conservators.








As to Robin, the trial court concluded that she
met the involuntary termination requirements of section 161.001 of the Texas
Family Code.  Specifically, the court
based its decision upon sections 161.001(1)(D), knowingly placing or allowing
the child to remain in conditions or surroundings which endanger the child=s
physical or emotional well-being; 161.001(1)(E), engaging in conduct or
knowingly placing the child with persons who engaged in conduct which endangers
the child=s physical or emotional
well-being; and 161.001(1)(L), having been convicted or placed on community
supervision for being criminally responsible for the death or serious injury of
a child under Texas Penal Code section 22.04; and meeting the best interest of
the child requirement under section 161.001(2). 
Tex. Fam. Code Ann '
161.001(1)-(2) (Vernon Supp. 2006).








As to David, the court stated in its order that
it had found by clear and convincing evidence that he did not respond by filing
an admission of paternity or by filing a counterclaim for paternity or for
voluntary paternity to be adjudicated under chapter 160 of the Texas Family Code
before the final hearing in the suit.  Id.
'
161.002(b)(1) (Vernon 2002).  It also
found by clear and convincing evidence that David had not registered with the
paternity registry.  Id. '
161.002(b)(2)(A)‑(B).  It made a
specific finding in the order that due diligence had been exercised Ain
attempting to identify, locate, and serve the alleged father.@  Id. '
161.002(e).  It terminated David=s
parental rights based upon these findings and upon section 161.001(1)(N),
constructive abandonment.  Id. '
161.001(1)(N).

On February 6, 2006, a hearing was held on Robin=s and
David=s
separate motions for new trial.  Both
were denied.  Although requested by each
appellant, the trial court did not file findings of fact and conclusions of
law.

DISCUSSION

A.  Robin=s Motion
For Continuance

In point nine, Robin contends that the trial
court abused its discretion in denying her motion for continuance, claiming
that when the State changed its position on termination, she received only
thirteen days= notice of this first contested
trial setting, an insufficient time to prepare for a termination case.








To determine whether a trial court abused its
discretion, we must decide whether the trial court acted without reference to
any guiding rules or principles; in other words, whether the act was arbitrary
or unreasonable.  Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241‑42 (Tex. 1985), cert. denied,
476 U.S. 1159 (1986).  Merely because a
trial court may decide a matter within its discretion in a different manner
than an appellate court would in a similar circumstance does not demonstrate
that an abuse of discretion has occurred. 
Id at 242.  Whether the
trial court grants or denies a motion for continuance is within its sound
discretion.  See BMC Software
Belg., N.V. v. Marchand, 83 S.W.3d 789, 800 (Tex. 2002).  Therefore, its ruling will not be reversed
unless the record shows a clear abuse of discretion.  Id.

Under rule 245, reasonable notice of the first
setting of a contested case for trial is Anot less
than forty-five days.@  Tex. R. Civ. P. 245; see
In re J.B., 93 S.W.3d 609, 614‑15 (Tex. App.CWaco
2002, pet. denied) (holding thirty‑two days= notice
of first setting for trial of contested case was insufficient).  When a contested case has been previously set
for trial, the court may reset it to a later date on any reasonable notice to
the parties.  Tex. R. Civ. P. 245.








At the July 21, 2005 permanency hearing, the
State announced that it would not be seeking termination, and the court set
what Robin asserts was an uncontested trial for December 8, 2005.[34]  Uncontested cases may be tried or disposed of
at any time, whether set or not.  Id.  But when the State announced at the November
10, 2005 hearing that it would seek termination after all, Robin claims that
the case became contested.[35]  We agree. 
This now-contested trial was set for March 14, 2006, which would have
provided Appellant with not less than forty-five days= notice
of the contested trial setting, in compliance with rule 245.  Id.

However, the court later rescheduled the
termination trial for December 15, 2005, to meet the suit=s
statutory dismissal date.[36]  See Tex.
Fam. Code Ann. ' 263.306(11).  Robin=s
attorney received notice of this rescheduling on December 2, 2005.  Nothing in rule 245 allows a court to
reschedule a contested hearing for a notice period of less than forty-five
days.  Tex.
R. Civ. P. 245.  Therefore, by
disregarding rule 245=s reasonable notice requirement
and overruling Robin=s motion for a continuance, the
trial court abused its discretion.  See
Downer, 701 S.W.2d at 241‑42; J.B., 93 S.W.3d at 614‑15.  Our analysis does not end here, however.








To obtain reversal of a judgment based upon an
error in the trial court, the appellant must show that (1) the error occurred
and (2) it probably caused rendition of an improper judgment, or probably
prevented the appellant from properly presenting the case to this court.  Tex.
R. App. P. 44.1(a); Romero v. KPH Consolidation, Inc., 166 S.W.3d
212, 220 (Tex. 2005); see also In re Baby Boy R., 191 S.W.3d 916, 922-23
(Tex. App.CDallas 2006, pet. denied)
(holding that even if court abused its discretion by not granting continuance,
father facing termination of parental rights failed to show how this probably
caused the rendition of an improper judgment). 
The fact that a party has received less than the forty‑five days= notice
required by rule 245 does not, standing alone, constitute harm.[37]  See J.B., 93 S.W.3d at 615.

In J.B., the mother=s
parental rights were first improperly terminated as a default judgment and then
when granted a new trial, she filed three consecutive motions for continuance
and still did not receive her forty-five days= notice
under rule 245.  Id. at
612-13.  The basis for all three motions
was that her attorney needed additional time to organize the Aapproximately
1,000 pages@ of documents provided by CPS
and to conduct other appropriate discovery.[38]  Id. at 612-13.  On appeal, the mother successfully argued
that she had been harmed because she did not have a sufficient opportunity to
conduct depositions she felt necessary to present her case.  Id. at 616-17.








Here, Robin=s
attorney made a single motion for a continuance.  He did not specify in his affidavit or at the
continuance hearing the reason why more time was needed, beyond referring
generally to discovery, sufficient time to meet with his client, and additional
preparation time for trial.[39]  Nothing was proffered in the affidavit, at
the continuance hearing, or in Robin=s brief
to demonstrate how denying her forty-five days= notice
of the contested trial resulted in harm, either through the rendition of an
improper judgment or in properly presenting her case to this court.[40]  Therefore, we must conclude that although
there was an abuse of discretion, there was no harm; we overrule Robin=s ninth
point.  See Tex. R. App. P. 44.1(a).

B.  Sufficiency Of The Evidence








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758‑59,
102 S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent‑child
relationship, it is also essential that emotional and physical interests of the
child not be sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to end them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination
proceedings and strictly construe involuntary termination statutes in favor of
the parent.  Holick, 685 S.W.2d at
20‑21; In re E.S.S., 131 S.W.3d 632, 636 (Tex. App.CFort
Worth 2004, no pet.).

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the Texas Family Code, the
petitioner must establish one or more of the acts or omissions enumerated under
subdivision (1) of the statute and must also prove that termination is in the
best interest of the child.  Tex. Fam. Code Ann. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).








In a trial to the court where no findings of fact
or conclusions of law are filed, the trial court=s
judgment implies all findings of fact necessary to support it.  Pharo v. Chambers County, 922 S.W.2d
945, 948 (Tex. 1996).  Where a reporter=s record
is filed, however, these implied findings are not conclusive, and an appellant
may challenge them by raising both legal and factual sufficiency of the
evidence points.  Where such points are
raised, the applicable standard of review is the same as that to be applied in
the review of jury findings or a trial court=s
findings of fact.  Roberson v. Robinson,
768 S.W.2d 280, 281 (Tex. 1989).

Termination of parental rights is a drastic
remedy and is of such weight and gravity that due process requires the
petitioner to justify termination by clear and convincing evidence.  Tex.
Fam. Code Ann. '' 161.001, 161.206(a); In re
J.F.C., 96 S.W.3d 256, 263 (Tex. 2002). 
This intermediate standard falls between the preponderance standard of
ordinary civil proceedings and the reasonable doubt standard of criminal
proceedings.  In re G.M., 596
S.W.2d 846, 847 (Tex. 1980); In re K.W., 138 S.W.3d 420, 425 (Tex. App.CFort
Worth 2004, pet. denied).  It is defined
as the Ameasure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@ 
Tex. Fam. Code Ann. '
101.007.








The higher burden of proof in termination cases
elevates the appellate standard of legal sufficiency review.  J.F.C., 96 S.W.3d at 265.  The traditional no‑evidence standard
does not adequately protect the parent=s
constitutional interests.  Id.  In reviewing the evidence for legal
sufficiency in parental termination cases, we must determine whether the
evidence is such that a fact-finder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  Id. at 265‑66.  We must review all the evidence in the light
most favorable to the finding and judgment. 
Id. at 266.  This means
that we must assume that the fact-finder resolved any disputed facts in favor
of its finding if a reasonable fact-finder could have done so.  Id. 
We must also disregard all evidence that a reasonable fact-finder could
have disbelieved.  Id.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must
consider evidence favorable to termination if a reasonable fact-finder could,
and disregard contrary evidence unless a reasonable fact-finder could not.  City of Keller v. Wilson, 168 S.W.3d
802, 827 (Tex. 2005).

If we determine that no reasonable fact-finder
could form a firm belief or conviction that the grounds for termination were
proven, then the evidence is legally insufficient, and we must generally render
judgment for the parent.  J.F.C.,
96 S.W.3d at 266; see Tex. R.
App. P. 43.3.








This higher burden of proof also elevates the
appellate standard of factual sufficiency review.  C.H., 89 S.W.3d at 25.  A[A]
finding that must be based on clear and convincing evidence cannot be viewed on
appeal the same as one that may be sustained on a mere preponderance.@  Id. 
In considering whether the evidence of termination rises to the level of
being clear and convincing, we must determine whether the evidence is such that
a fact-finder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  Id.  Our inquiry here is whether, on the entire
record, a fact-finder could reasonably form a firm conviction or belief that the
parent violated one of the conduct provisions of section 161.001(1) and that
the termination of the parent=s
parental rights would be in the best interest of the child.  Id. at 28.








The distinction between legal and factual
sufficiency lies in how we review the evidence. 
J.F.C., 96 S.W.3d at 266. 
In a factual sufficiency review, in determining whether the evidence is
such that a fact-finder could reasonably form a firm belief or conviction that
its finding was true, we must consider whether disputed evidence is such that a
reasonable fact-finder could not have resolved it in favor of the finding.  Id. 
If, in light of the entire record, the disputed evidence that a
reasonable fact-finder could not have credited in favor of the finding is so
significant that a fact-finder could not reasonably have formed a firm belief
or conviction in the truth of its finding, then the evidence is factually
insufficient.  Id.  If we reverse on factual sufficiency grounds,
then we must detail in our opinion why we have concluded that a reasonable
fact-finder could not have credited disputed evidence in favor of its
finding.  Id. at 266‑67.

1.  Robin=s
Sufficiency Claims

Robin=s first
eight points address legal and factual sufficiency of the evidence to meet the
statutory requirements for involuntary termination of parental rights in
section 161.001(1) and (2) of the Texas Family Code.  In points five and six, she claims that the
evidence was legally and factually insufficient to support the finding that she
engaged in conduct which endangered E.A.W.S.=s
physical or emotional well‑being.[41]  Tex.
Fam. Code Ann. ' 161.001(1)(E).  The State asserts that the evidence was amply
sufficient to prove that Robin=s
conduct before, during, and after her pregnancy constituted an endangerment to
E.A.W.S.








Under section 161.001(1)(E), the relevant inquiry
is whether evidence exists that the endangerment of the child=s
physical or emotional well‑being was the direct result of the parent=s
conduct, including acts, omissions, or failures to act.  Id. '
161.001(1)(E); In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.).  Termination under
section 161.001(1)(E) must be based on more than a single act or omission; it
requires a voluntary, deliberate, and conscious course of conduct.  J.T.G., 121 S.W.3d at 125.  However, it is not necessary that the parent=s
conduct be directed at the child or that the child actually suffer injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125. 








To determine whether termination is necessary
because of endangerment, courts may look to parental conduct both before and
after the child=s birth.  In re D.M., 58 S.W.3d 801, 812 (Tex. App.CFort
Worth 2001, no pet.); see also In re U.P., 105 S.W.3d 222, 234 (Tex.
App.CHouston
[14th Dist.] 2003, pet. denied) (using illegal drugs while pregnant as evidence
of endangerment).  The specific danger to
the child=s well‑being may be
inferred from parental misconduct alone. 
Boyd, 727 S.W.2d at 533; In re R.W., 129 S.W.3d 732, 738,
741 (Tex. App.CFort Worth 2004, pet. denied)
(abusing drugs and alcohol, which contributed to mental instability and
suicidal ideation, were a consideration in endangerment finding).  Drug abuse during pregnancy constitutes
conduct that endangers a child=s
physical and emotional well‑being. See In re W.A.B., 979 S.W.2d
804, 806 (Tex. App.CHouston [14th Dist.] 1998, pet.
denied) (using illegal drugs during and after pregnancy); Dupree v. Tex. Dep=t Prot.
& Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).

A parent=s mental
state may be considered in determining whether a child is endangered if that
mental state allows the parent to engage in conduct that jeopardizes the child=s
physical or emotional well‑being.  In
re J.I.T.P., 99 S.W.3d 841, 845 (Tex. App.CHouston
[14th Dist.] 2003, no pet.); In re C.D., 664 S.W.2d 851, 853 (Tex. App.CFort
Worth 1984, no writ).  This includes a
parent=s
attempts to commit suicide.  See In re
A.M.C., 2 S.W.3d 707, 716 (Tex. App.CWaco
1999, no pet.) (finding endangerment from mother=s
suicidal thoughts, suicide attempts, and neglect).  Conduct that subjects a child to a life of
uncertainty and instability also endangers the child=s
physical and emotional well‑being. 
See In re S.D., 980 S.W.2d 758, 763 (Tex. App.CSan
Antonio 1998, pet. denied) (using illegal drugs and violating parole provided
sufficient evidence of endangerment).








Acts done in the distant past, without a showing
of a present or future danger to a child, cannot be sufficient to terminate a
parent=s
rights.  See Wetzel v. Wetzel, 715
S.W.2d 387, 391(Tex. App.CDallas 1986, no writ) (finding
no endangerment when parent was cured of mental problems related to the child
abuse that occurred four years before). 
But evidence of abuse of another child, coupled with a present or future
danger to the child in question, is relevant to determine whether a parent has
engaged in an endangering course of conduct, even if the abuse occurred prior
to the birth of the subject child.  See
In re Cochran, 151 S.W.3d 275, 280 (Tex. App.CTexarkana
2004, no pet.) (stating that in the absence of any Acurrent@
conditions or actions that would constitute a danger to the child=s health
or safety, the trial court could not have reasonably based its findings on
prior terminations alone); In re K.M.M., 993 S.W.2d 225, 227‑28
(Tex. App.CEastland 1999, no pet.) (finding
endangerment when parent was incarcerated prior to birth of child at issue for
sexual assault of a fifteen month-old child three years prior).








        Neglect can be just as dangerous to a child=s
emotional and physical health as intentional abuse.  In re W.J.H., 111 S.W.3d 707, 715
(Tex. App.CFort Worth 2003, pet.
denied).  If a parent abuses or neglects
the other parent or children, that conduct can be used to support a finding of
endangerment even against a child who was not yet born at the time of the
conduct.  Id. at 716; see also
In re S.P., 168 S.W.3d 197, 202-04 (Tex. App.CDallas 2005,
no pet.) (taking child from hospital before mother could take child home did
not preclude finding of endangerment); In re D.T., 34 S.W.3d 625, 636‑37
(Tex. App.CFort Worth 2000, pet. denied)
(stating that evidence of conduct before child is born, as well as evidence as
to how a parent has treated another child or spouse, is relevant regarding
whether a course of conduct under section 161.001(1)(E) has been
established).  Imprisonment is another
factor to be considered by the trial court on the issue of endangerment.  Boyd, 727 S.W.2d at 533.  However, the relationship of the parent and
child, as well as efforts to improve or enhance parenting skills, are also
relevant in determining whether a parent=s
conduct results in Aendangerment@ under
section 161.001(1)(E), even when the parent is incarcerated.  D.T., 34 S.W.3d at 640.













We look at Robin=s
conduct before and after E.A.W.S.=s birth
to determine whether termination is necessary because of endangerment.  See D.M., 58 S.W.3d at 812.  The specific dangers to E.A.W.S.=s well‑being
may be inferred from Robin=s
misconduct alone.  See Boyd,
727 S.W.2d at 533.  Robin took an
overdose of Ambien while thirty-nine weeks=
pregnant.  Whether she did this
intentionally, to commit suicide, or by accident, she endangered E.A.W.S.=s
physical well-being before E.A.W.S. was born.[42]  See J.T.G., 121 S.W.3d at 122-23,
126-27; W.A.B., 979 S.W.2d at 806‑08.  On the same day as the Ambien overdose, an
argument with her grandmother escalated to the point that Robin called the
police.  There was disputed testimony
about actual physical violence during the altercation between Robin and her
grandmother, and abuse Robin herself may have suffered as a child, which tend
to establish a pattern of family violence, even without considering Robin=s
history with her own children.  See
J.T.G., 121 S.W.3d at 122-23, 127. 
Before E.A.W.S.=s birth, Robin served two years
of a three-year sentence after pleading nolo contendere to injury to a child, a
felony, for the twelve fractures suffered by her child T.A.D. when T.A.D. was
around six weeks old.  If Robin had not
taken the overdose while pregnant with E.A.W.S., her prior acts of abuse in the
distant past would not be sufficient alone to terminate her parental rights to
E.A.W.S.  See K.M.M., 993
S.W.2d at 227-28.  However, the attempted
suicide comprised a present and future danger to E.A.W.S. from Robin, so it was
relevant for the trial court to also consider other acts of endangering conduct
by Robin.  Id at 228.  Robin said she did not know exactly how the
injuries to T.A.D. were inflicted.  She
did acknowledge feeling responsible that the injuries took place in her home,
and admitted to being neglectful, but claimed she did nothing
intentionally.  Robin=s
grandmother testified that as to T.A.D.=s
injuries, Robin was negligent.[43]  Neglect can be as endangering to a child=s health
as intentional abuse.  W.J.H., 111
S.W.3d at 715.  Evidence of Robin=s
conduct before E.A.W.S. was born, as well as evidence of how Robin treated
T.A.D. and other family members is relevant to determining whether a course of
conduct has been established.  D.T.,
34 S.W.3d at 636‑37.

In addition to testifying about her fight with
David, Robin also testified that when she lived with N.C.D. and T.A.D.=s
father, he kicked her in the stomach when she was pregnant with T.A.D. and that
there was Aalways conflict@ between
them.  She testified that she and her
grandmother Aclash.@ David
requested that E.A.W.S. be placed with him when CPS first contacted him about
E.A.W.S.=s
removal from Robin, because he did not believe that E.A.W.S. was safe with
Robin.








In Wetzel, the court reversed a
termination decision because the mother was able to prove that she was cured of
the mental problems that were directly related to her abuse of her
children.  715 S.W.2d at 390-91.  After E.A.W.S.=s birth,
Robin still showed instances of mental instability and agitation, including
threatening behavior and suicidal ideation, and failed to regularly take her
medication.  See Dupree, 907
S.W.2d at 84.  She failed to attend
counseling set up by CPS and a CPS drug assessment, and several witnesses
testified that Robin=s behavior had not improved
despite classes, therapy, counseling, and medication.  Robin did testify that she paid for and took
some parenting and stress management classes on her own; however, she admitted
at the termination trial that she was still unable to take care of her
children, even though she had a place to live and a job.








We have carefully reviewed the entire
record.  The trial court could have
reasonably resolved disputed facts, such as whether the overdose was
intentional and suicidal or accidental and negligent, whether the incident
between Robin and her grandmother immediately before E.A.W.S.=s birth
involved actual violence, and whether Robin behaved intentionally or
negligently with regard to the prior abuse suffered by T.A.D., in favor of its
findings.  Legally sufficient evidence
exists that Robin=s acts, omissions, and failures
to act constituted a course of conduct that directly resulted in E.A.W.S.=s
physical and emotional endangerment.  See
J.T.G., 121 S.W.3d at 125.  The
evidence at trial showed that Robin knowingly engaged in conduct that
endangered E.A.W.S.=s physical or emotional well‑being,
based on her acts and choices before and after E.A.W.S.=s
birth.  See Tex. Fam. Code Ann. '
161.001(1)(E); D.M., 58 S.W.3d at 812. 
Having reviewed all the evidence in the light most favorable to the
finding and the judgment, we hold that the evidence here is legally sufficient
such that the trial court could reasonably have formed a firm belief that the
endangerment ground for termination was proven.  J.F.C., 96 S.W.3d at 265-66.

Additionally, based on our review of the entire
record, a fact-finder could reasonably form a firm belief or conviction that
the endangerment ground for termination was proven, based upon Robin=s
overdose while pregnant with E.A.W.S., failure to consistently take her
medication, the history and pattern of abusive relationships between herself
and others, and her severe depression and fragile mental state.  See Tex.
Fam. Code Ann. ' 161.001(1)(E); C.H., 89
S.W.3d at 25; J.F.C., 96 S.W.3d at 265‑66; J.T.G., 121
S.W.3d at 124-25.  Accordingly, we also
hold that the evidence is factually sufficient to support the trial court=s
finding on endangerment.  We overrule
Robin=s fifth
and sixth points.

Robin argues in her first and second points that
the evidence was legally and factually insufficient to find that termination of
her parental rights was in the best interest of E.A.W.S.








The purpose of the State=s
intervention in the parent‑child relationship is to protect the best
interest of the child, not to punish parents for their conduct.  In re A.V., 113 S.W.3d 355, 361 (Tex.
2003).  Although the termination suit can
result in a parent=s loss of his or her legal
relationship with the child, the primary focus is protecting the child=s best
interests.  Id.  Nonexclusive factors that the trier of fact
in a termination case may use in determining the best interest of the child
include

(1)    the
desires of the child;

(2)    the
emotional and physical needs of the child now and in the future;

(3)    the emotional and physical
danger to the child now and in the future; 

 

(4)    the
parental abilities of the individuals seeking custody;

(5)    the programs available to
assist these individuals to promote the best interest of the child;

 

(6)    the plans for the child by
these individuals or by the agency seeking custody;

 

(7)    the
stability of the home or proposed placement;

(8)    the acts or omissions of
the parent which may indicate that the existing parent‑child relationship
is not a proper one; and

 

(9)    any
excuse for the acts or omissions of the parent.








Holley v. Adams, 544 S.W.2d 367, 371‑72 (Tex.
1976).  These factors are not
exhaustive.  Some listed factors may be
inapplicable to some cases; other factors not on the list may also be
considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the children.  Id. 
On the other hand, the presence of scant evidence relevant to each
Holley factor will not support such a finding. 
Id.

Robin argues that the State asked the court to
view the best interest factors Athrough
1999 glasses,@ asserting that she has matured
since the events that led to her incarceration for injury to her child
T.A.D.  However, the State removed
E.A.W.S. from Robin in 2005, two days after E.A.W.S.=s birth,
due to the Ambien overdose.  It is
disputed whether Robin actually intended to commit suicide by overdosing on Ambien.  However, vomiting had to be induced at the
hospital because Robin could not recall how many pills she had taken.  Even without considering her prior conviction
for injury to a child, the trial court could reasonably have found that
overdosing, even unintentionally, while thirty-nine weeks=
pregnant would have a negative effect on E.A.W.S.=s
emotional and physical needs, as well as create emotional and physical danger
to E.A.W.S., now and in the future.  One
of the caseworkers testified that Robin told her that she had tried to kill
only herself, and not the baby, with the Ambien.  The trial judge could have also reasonably
concluded that Robin was suicidal, from this testimony and Robin=s own
admission that she suffers from severe depression and has attempted suicide
before.








E.A.W.S. also appears to have some special needs,
and was described as a Ahigh-demand@ child
even at eleven months old.[44]  At the time of trial, the evidence showed
that Robin continued to have trouble coping with her own emotional problems and
controlling her aggressive tendencies.

The other individuals seeking custody of
E.A.W.S., E.A.W.S.=s paternal aunt Victoria and her
husband, have raised three children to adulthood.  Quam, the CASA worker appointed to E.A.W.S.=s case,
testified that Victoria and her husband would best serve E.A.W.S.=s best
interests because of their experience, maturity, and Aability
to calmly figure out what is best.@[45]  Victoria and her husband plan to adopt
E.A.W.S.








Based on the undisputed facts alone, we conclude
that the trial judge could reasonably have developed a firm belief or
conviction that termination of Robin=s
parental rights would be in E.A.W.S.=s best
interest.  Because the disputed evidence
is also such that a reasonable fact-finder could have resolved it in favor of
the best interest finding, we hold that the evidence in the record was both
legally and factually sufficient to prove that termination of Robin=s
parental rights was in E.A.W.S.=s best
interest.  We overrule Robin=s first
two points.  See J.F.C., 96 S.W.3d
at 265‑66; C.H., 89 S.W.3d at 25.

We do not reach Robin=s
remaining points raised on legal and factual sufficiency of the trial court=s
conduct findings because only one predicate finding under section 161.001(1) is
necessary to support a judgment of termination when there is also a finding
that termination is in the child=s best
interest.  A.V., 113 S.W.3d at
362.

 

 

2.  David=s
Sufficiency Claims








In his first two points, David argues that there
was insufficient evidence to support the trial judge=s
finding that the State made reasonable efforts to return E.A.W.S. to him, under
section 161.001(1)(N)(i) of the Texas Family Code, or to support the trial
judge=s
finding that he failed to respond by filing an admission of paternity.  Tex.
Fam. Code Ann. '' 161.001(1)(N), 161.002. The
State counters that David willfully failed to answer or appear in the lawsuit,
such that he admitted all the elements of the termination petition, and
therefore default judgment was appropriate.

Under Texas Rule of Civil Procedure 239, a
default judgment may be granted when citation with the officer=s return
has been on file with the clerk for the length of time required by rule 107,
that is, ten days.  Tex. R. Civ. P. 239; 107.  But if an answer is filed after the answer
date, but before the trial court renders the default judgment, it is error for
the court to render a default judgment.  Davis
v. Jefferies, 764 S.W.2d 559, 560 (Tex. 1989); Frank v. Corbett, 682
S.W.2d 587, 588 (Tex. App.CWaco
1984, no writ) (reversing default judgment even though answer was neither
signed by defendant nor filed by trial court clerk in the trial court
file).  Unlike a no‑answer default
judgment, in which a defendant admits the petition=s
allegations by his failure to answer, a post‑answer default judgment
constitutes neither an abandonment of a defendant=s answer
nor an implied confession.  Stoner v.
Thompson, 578 S.W.2d 679, 682 (Tex. 1979). 
Therefore, judgment cannot be entered on the pleadings, and the
petitioner in such a case must offer evidence and prove his case.  Id.








A defendant who timely files a pro se answer by a
signed letter that identifies the parties, the case, and the defendant=s
current address has sufficiently appeared by answer.  Smith v. Lippmann, 826 S.W.2d 137, 138
(Tex. 1992); see also Santex Roofing & Sheet Metal, Inc. v. Venture
Steel, Inc., 737 S.W.2d 55, 56‑57 (Tex. App.CSan
Antonio 1987, no writ) (noting reluctance to enter default judgment when some
response is found).[46]








David=s
signed, notarized, and witnessed affidavit, which he sent in response to the
request by E.A.W.S.=s child advocate that he Awillingly
relinquish@ his parental rights and which
stated the condition under which he would be willing to do so, i.e., upon the
court=s
judgment granting full and permanent custody of E.A.W.S. to his sister and her
spouse, stated the cause number and the names of the parties involved.  See Custom‑Crete, 82 S.W.3d at
657‑58.  It also contained his
address at the top of the first page.  See
Home Sav. of Am. FSB, 928 S.W.2d at 218. 
Thus, we conclude, in spite of the court=s
statement in the Aappearances@ section
of the termination order that David Adid not
appear and wholly made default,@ that
David did file an answer before judgment was rendered, and therefore a no‑answer
default judgment was inappropriate.[47]








Because this was a post-answer default judgment,
the State had to prove each element in its claim.  Stoner, 578 S.W.2d at 682.  However, so long as we find that at least one
of the grounds for termination was supported by the evidence and that
termination is in E.A.W.S.=s best
interest, we may uphold the trial court=s
judgment even if there was not sufficient evidence to support termination on
the other grounds.  In re A.R.R.,
61 S.W.3d 691, 698 (Tex. App.CFort
Worth 2001, pet. denied), disapproved on other grounds by A.V., 113
S.W.3d at 360.

a.  Sufficiency Of The Evidence
Under Section 161.002(b)(1), (2)

Section 161.002 of the Texas Family Code
addresses the termination of parental rights of an Aalleged
biological father.@ 
Tex. Fam. Code Ann. '
161.002.  The rights of an alleged father
may be terminated if

(1) after being served with citation, he does not
respond by timely filing an admission of paternity or a counterclaim for
paternity under Chapter 160; or        

 

(2) he has not registered
with the paternity registry under Chapter 160, and after the exercise of due
diligence by the petitioner:

(A) his identity and location are unknown; or

(B) his identity is known but he
cannot be located.

Id. '
161.002(b)(1), (2)(A)-(B); Phillips v. Tex. Dep=t of
Prot. & Regulatory Servs., 25 S.W.3d 348, 357 (Tex. App.CAustin
2000, no pet.) (stating that subsection 161.002(b)(1) allows the State to
summarily terminate the rights of an alleged biological father who does not
assert his paternity).  However, if the
alleged father files an admission of paternity or otherwise claims paternity,
then the alleged father is able to stave off summary termination of his rights,
and the State must instead meet the higher burden of proof found in section
161.001. Tex. Fam. Code Ann. '
161.002(a); Phillips, 25 S.W.3d at 357.








This court has held that there are no formalities
that must be observed for an admission of paternity to be effective; an
admission of paternity in letters written to the trial court will suffice.  K.W., 138 S.W.3d at 430; see also
Estes v. Dallas County Child Welfare Unit of Tex. Dep=t of
Human Servs., 773 S.W.2d 800, 802 (Tex. App.CDallas
1989, writ denied) (holding that appellant=s
statement in pro se answer that he was an indigent parent was sufficient to
constitute an admission of paternity under former version of section
161.002(b)).  In K.W., the father
sent several letters in which he asserted he was the child=s
biological father.[48]  138 S.W.3d at 429.  We concluded that the father=s
letters to the Texas Department of Protective and Regulatory Services (ATDPRS@)[49]
and to the court constituted admissions of paternity sufficient to put TDPRS
and the trial court on notice that he admitted his paternity and wanted to
oppose termination of any rights he might have with respect to the child at
issue.  Id. at 430.








Here, David sent a signed, notarized, and
witnessed typewritten affidavit to the court in which he stated his full name
followed by Ahereinafter referred to as me,
my, or respondent father@ and in which he agreed to
relinquish his parental rights to E.A.W.S. 
As we noted in K.W., the issue of whether the child=s
parentage was established, as opposed to whether it was simply admitted by him,
was not before the trial court, and therefore is not before us.  See id.  Accordingly, we conclude that David admitted
his paternity of E.A.W.S. for purposes of section 161.002(b)(1). 

To render an order terminating parental rights
under 161.002(b)(2), the State must have filed a sworn affidavit describing its
effort to identify and locate the alleged father, and the trial court must then
find that the State exercised due diligence in attempting to identify and
locate him.  Tex. Fam. Code Ann. '
161.002(e).  The trial court=s order
must contain specific findings regarding due diligence of the petitioner.  Id.








Our record does not contain any such sworn
affidavit filed by the State and reviewed by the trial court.  See id.  Although the certificate of paternity
registry search conducted on November 1, 2005, shows that David had not filed a
notice of intent to claim paternity for E.A.W.S., the record indicates that
David=s
identity was known to CPS and that CPS contacted him on January 21, 2005, after
E.A.W.S.=s
birth.  The record indicates that he was
served with the original petition on March 25, 2005, at the same address listed
on his affidavit submitted on the day of the termination trial.[50]  Therefore we conclude that section
161.002(b)(2) cannot apply to terminate David=s
parental rights, because his identity was known, and he had been located.  Tex.
Fam. Code Ann. ' 161.002(b)(2); see K.W.,
138 S.W.3d at 431.

b.  Sufficiency Of The Evidence
Under Section 161.001(1)(N)

The court cited section 161.001(1)(N) as an
additional ground for terminating David=s
parental rights.  Section 161.001(1)(N)
provides that the court may order termination of the parent‑child
relationship if the court finds by clear and convincing evidence that the
parent has

constructively abandoned
the child who has been in the permanent or temporary managing conservatorship
of the Department of Family and Protective Services or an authorized agency for
not less than six months, and:

 

(i) the department or
authorized agency has made reasonable efforts to return the child to the
parent;

 

(ii)
the parent has not regularly visited or maintained significant contact with the
child; and

 

(iii)
the parent has demonstrated an inability to provide the child with a safe
environment.

 








Id. '
161.001(1)(N); In re B.S.T., 977 S.W.2d 481, 486 (Tex. App.CHouston
[14th Dist.] 1998, no pet.), overruled in part on other grounds by C.H.,
89 S.W.3d at 26.  David contests the
implied finding that the State made reasonable efforts to return E.A.W.S. to
him, but does not contest the other findings that support termination under
this ground.

Returning a child to a parent, under
section161.001(1)(N)(i), does not necessarily mean that the child has to be
physically delivered to the individual.  See
In re D.S.A., 113 S.W.3d 567, 573 (Tex. App.CAmarillo
2003, no pet.).  AReasonable
efforts@ to
reunite parent and child can be satisfied through the preparation and
administration of service plans.  See
Id. at 570-72; In re K.M.B., 91 S.W.3d 18, 25 (Tex. App.CFort
Worth 2002, no pet.).

In D.S.A., within several days of the
father=s
release from prison, a CPS worker spoke with him about a plan of service and
visitation and twice arranged meetings with him that he failed to attend.  113 S.W.3d at 570.  He failed to attend any of the appointments
and classes arranged for him in the service plan and did not exercise any
visitation rights.  Id. at
570-71.  CPS=s
activities were held sufficient to meet the requirement of reasonable efforts
to return the child.  Id. at 572.








In K.M.B., the State demonstrated that it
had prepared several service plans designed to facilitate returning the child
to the parent, but that the parent never completed any of them; these were held
reasonable efforts by the State.  91
S.W.3d at 25.  In B.S.T., the
court held the evidence sufficient to support termination under subsection
(N)(i) when a caseworker testified that all reasonable efforts had been made to
return the children to the parents.  977
S.W.2d at 486.  In that case, there was
sufficient evidence that although the father was not provided a separate family
service plan, the mother did not know his whereabouts at the time the children
were taken into custody, and after he was located by CPS and advised about
visitation, he made no effort beyond two visits to be involved with the
children.  Id.  Caseworkers also advised him that he should
sign an affidavit of paternity, but he never did so.  Id.








We have painstakingly combed the record for
traces of any efforts on the part of the State to return E.A.W.S. to
David.  Of the two volumes of trial
testimony, David is rarely mentioned.[51]  Most of the testimony by CPS caseworkers and
other witnesses pertains to Robin.








CPS worker Stewart testified that a few days
after E.A.W.S. was born, she was able to obtain a phone number for David and
contacted him at that number on January 21, 2005.  Cf. B.S.T., 977 S.W.2d at 486.  At that time, David indicated to Stewart his
interest in seeing if E.A.W.S. could be placed with him.  CPS never completed a home study on his home.[52]  There is no evidence in the record that CPS
advised him about visitation.  Cf.
D.S.A., 113 S.W.3d at 570; B.S.T., 977 S.W.2d at 486.  Campbell, the CPS supervisor, testified that
her recommendation was that it was in E.A.W.S.=s best
interest that David=s rights be terminated, and to
her understanding, David was in agreement with that.  Campbell was asked the following question
during her testimony at the termination trial:

Q:     And
through the course of working this case, was it your position as the supervisor
that the Department=s efforts in this case
needed to be focused on relative placement rather than a family reunification
plan?

 

A:     Yes.

Prior to this question, the testimony related exclusively to Robin and
her interaction with Victoria, Roy, and E.A.W.S.

After testifying about Robin, the ongoing CPS
caseworker, Sweeney, who worked under Campbell, was asked,

Q:     Do
you also believe that it=s in this child=s best interest that if
there are any parental rights in place between her and David [W.], that those
parental rights should be terminated?

 

A:     Yes.

When asked if it was her understanding that David was in agreement
with that, she answered affirmatively.








Robin is the only parent listed on either of CPS=s
service plans, even though CPS was able to make contact with David and he
indicated his interest in E.A.W.S. upon that contact.  Cf. D.S.A., 113 S.W.3d at 570;
K.M.B., 91 S.W.3d at 25; B.S.T., 977 S.W.2d at 486.  While there is no evidence in the record that
David made any attempts to visit E.A.W.S. or to arrange visitation, there is
also no evidence that he failed to make any such attempts.  There is a complete lack of testimony in the
record by any of the CPS caseworkers about any efforts, reasonable or
otherwise, to return E.A.W.S. to David.

Without any evidence of an effort by CPS to
return E.A.W.S. to David, no reasonable fact-finder could form a firm belief or
conviction that this element in the constructive abandonment ground for
termination was proven.  See J.F.C.,
96 S.W.3d at 265-66.  Because we have
held the evidence is legally insufficient to support any of the three grounds
for termination alleged by the State against David, we must reverse and render
judgment in his favor.[53]  Id. at 266.

 

C.  David=s
Constitutional Challenge








David argues that section 263.405(i) of the Texas
Family Code violated his due process rights under the United States and Texas
Constitutions, by unduly restricting his appeal.[54]  Because he has not alleged any issue that he
was precluded from raising on appeal as a result of section 263.405(i)=s
application, and because we have determined that the termination of his
parental rights must be reversed on other grounds, we will not address this
constitutional challenge.  See Tex. R. App. P. 47.1.

 

 

 

CONCLUSION








Having overruled Robin=s
points, we affirm the termination of her parental rights to E.A.W.S.  We reverse the trial court=s
judgment terminating David=s
parental rights to E.A.W.S. and render judgment in his favor.  We affirm the remainder of the trial court=s
judgment.[55]


 

 

DIXON
W. HOLMAN

JUSTICE

PANEL A:  LIVINGSTON, HOLMAN,
and WALKER, JJ.

DELIVERED:  December 7, 2006











[1]See Tex. R. App. P. 47.4.





[2]To protect the privacy of the parties involved in this
appeal, we identify the child by initials only and the Appellants by first name
only.  See Tex. Fam. Code Ann. ' 109.002(d) (Vernon 2002).





[3]Robin=s doctor prescribed Ambien for her.





[4]Victoria saw Robin at least once a week while Robin
was pregnant and took Robin to her doctors= appointments. 
Robin lived with Victoria and her husband, Roy, for around four months
after E.A.W.S. was born.





[5]According to Victoria, the people with whom Robin
began associating Aall had CPS cases against them.@  Robin was going to bars with these people and
drinking while on prescription medication.





[6]These caseworkers were Stewart, Daphne Campbell, and
Julianne Sweeney.  All three testified at
the termination trial.





[7]Victoria testified that when E.A.W.S. was placed in
her home, Campbell, the ongoing caseworker=s supervisor, told her that she should distance her
relationship with Robin.  According to
Victoria, this was because of CPS=s concern that she otherwise Amight
have crossed the line and permitted the baby to be alone with Robin or allowed
Robin to take the baby.@





[8]Robin was eighteen years old when she had B.A.S.





[9]It would appear from the record that she served two
years, and then had one year of parole. 
Her parole was revoked twice, after which she chose to return to prison
to serve the remainder of her time.  She
stated at the termination trial, AI told them I=d rather finish my time and get it over with and start
my life.@





[10]These fractures included three skull fractures and
fractures of both clavicles, three ribs, the right femur, and the right distal
radius bone.  At eighteen months old,
N.C.D. had a cigarette burn on the side of his mouth.





[11]Stewart testified that Robin told her that Ashe had
suffered every type of abuse that you could think of.@  Victoria testified that Robin told her about
abuse by Robin=s uncles, from age ten to sixteen.  She stated that Robin told her Athat her
uncles [were] particularly violent, that she=s been assaulted, that . . . she has a scar on her
face where one of her uncles literally tore her lip.@

Robin=s aunt Linda testified that she was aware that Robin
had been abused by her uncles.  In
contrast, Beulah, Robin=s grandmother, testified that she was not aware that
Robin had been abused by Beulah=s sons while she grew up in Beulah=s
home.  Beulah stated, AShe was
never abused by my son,@ and denied being aware of any CPS investigation of
that abuse.

Brooks, the CPS caseworker from 1999,
testified that she had checked the CAPS system to see if there was any CPS
history that involved Robin as a child and that she had found one case from
October 1992, a Areason-to-believe physical abuse@ by her
uncle.





[12]Whether actual physical violence occurred during the
altercation between Robin and her grandmother is disputed.  Victoria testified that when Robin called her
before going to the hospital, Robin told her that she and her grandmother had
had a fight and that her grandmother had hit her and she had hit her
grandmother.





[13]One of the conditions of Robin=s parole
was to not associate with known felons. 
At the time they met, David was also wearing an electronic monitor.  Robin testified that she did not know that
meant she could not talk to him outside of the AA/NA meetings.





[14]There is nothing in the record to indicate that any
such requests were made.





[15]The trial judge noted for the record before the
termination hearing began that Aon file with this court is the Certificate of
Paternity Registry Search indicating that a diligent search of the Paternity
Registry has been made and no Notice of Intent To Claim Paternity has been
located concerning the child the subject of this suit.@  See Tex.
Fam. Code Ann. ' 161.002(b) (2)(A)‑(B) (Vernon 2002).





[16]Most of this testimony consisted of Victoria=s
statements about David=s concerns about Robin and E.A.W.S.  There is no testimony about how frequently
she was in contact with him.





[17]Victoria testified that David has spent time in
prison, has attention deficit/hyperactivity disorder, and would not be able to
properly parent E.A.W.S.  She testified
that A[h]e=s 43 years old, and he=s never parented anything.@





[18]The State had also filed a motion for a finding of
aggravated circumstances, under Texas Family Code section 262.2015(b)(6)(D),
based on Robin=s 2001 conviction. 
A hearing on that motion was set for November 8, 2005.  Section 262.2015(b)(6)(D) addresses the
felony assault of the child or another child of the parent that resulted in
serious bodily injury to the child or another child of the parent.  Tex.
Fam. Code Ann. ' 262.2015(b)(6)(D) (Vernon Supp. 2006).





[19]Robin=s attorney stated that he effectively had a little
over a month=s notice of the plan to seek termination, although he
acknowledged at the hearing that Athey [TDFPS] always put termination in their
pleadings, and I guess that=s our official notice.@





[20]Victoria also testified about her concerns about Robin=s
family, in that ARobin has a number of close family members, uncles,
aunts, that drink to excess and have been known to exhibit violence when they
do toward their own family members.@





[21]According to Victoria=s testimony, Robin has problems swallowing large pills
and that was Robin=s explanation for not taking some of her medication. 





[22]Robin testified that she and B.A.S. went to Boy Scouts
and to the dollar movies and that she visited him every week.





[23]N.C.D.=s paternal grandmother testified that N.C.D. was
kicked out of school on his first day of first grade and that he had to switch
schools.  Former CPS worker Misty Wall
testified that at eighteen months old, N.C.D. was extremely aggressive, needed
intense counseling, and that hospitalization and medication were considered for
him.  While in foster care, he would
scrape on his leg with a fork until it bled, bite his lips until he bled, and
bang his head until he had cuts and bruises. 
At one point, he stabbed the foster family=s cat and threw it in the pool.





[24]Robin said, AYou can=t change the things you=ve been through, you know, and I wouldn=t change
them for the simple fact that it wouldn=t make me the person I am today, and I=m very
proud of the person I am today. I don=t care what anybody says.@





[25]The March service plan indicates that CPS was not able
to locate David Abefore the PPT.@





[26]The July service plan indicates in its visitation
summary that David Ahas not engaged in visits.@  It also indicates that David was in Missouri
and that ACPS has not been able to locate him before the PPT.@





[27]AIN RE:
[E.A.W.S.]. CAUSE NO. 323-79632J-05.@





[28]This is the official name of the office, which handles
criminal and civil cases, including representing the State of Texas in
proceedings brought to terminate parental rights.  See Tarrant County District
Attorney,  http://www.tarrantda.com (last
visited Oct. 17, 2006).





[29]She added, ATo me, what I would do if we had received it a month
ago is we would file-mark it and give copies to everybody, so I guess that=s what I=ll do at
this time.@





[30]At the top of the affidavit, the trial judge wrote ADecember
15, 2005, filed in court at 9:00 a.m.,@ and initialed it.





[31]David made no mention of pauper status in the
affidavit.  He did claim pauper status in
a request for counsel filed for his appeal.





[32]In the affidavit, David further stated that A[w]ith
the Court=s granting, and expediting this adoption, [E.A.W.S.]
will be in a loving, secure household, surrounded by her sister, cousins,
aunts, uncles, and grandparents, and further, with this adoption I too, can and
will be the best that I can be part of her life!@ After this statement, David added, AI pray
this Honorable Court does not have the wrong impression of me, I wish this
situation had never presented itself.@ 





[33]Under AAppearances@ in the order, the court stated that ARespondent
Father, DAVID [W.], although duly and properly notified, did not appear and
wholly made default.@





[34]Robin=s attorney asserted in his affidavit that the setting
on December 8, 2005 was not a setting for a termination trial, but rather, that
it was Aessentially scheduled as an uncontested matter.@





[35]At the continuance hearing, Robin=s
attorney stated that Robin did not want her rights terminated and that she
wanted to be involved in her daughter=s life, even if that would be through limited
visitation for the immediate future. 





[36]The suit=s dismissal date was January 23, 2006.





[37]This court has addressed abuse of discretion
separately from the rule 44.1 harm analysis. 
See McMeekin v. McMeekin, No. 02‑05‑00118‑CV,
2006 WL 820399, at *4 (Tex. App.CFort Worth March 30, 2006, no pet. h.) (mem. op.).





[38]In J.B., the mother=s
counsel complained that the file provided by CPS, in addition to containing
approximately 1,000 pages, was Acompletely out of order,@ and needed to be organized, categorized, and reviewed
before he would even be able to depose witnesses.  93 S.W.3d at 616. 





[39]At the continuance hearing, the State=s
attorney offered, A[W]e=ve pulled copies of this case material off of the
system at CPS . . . and we=d be happy to give those to Mr. Gault [Robin=s
attorney] without his need for a formal discovery if that helps at all.@





[40]Further, Robin=s attorney acknowledged at the continuance hearing
that termination was listed in all of the pleadings.





[41]Under section 161.001(1)(E), the court may order
termination of the parent-child relationship if the court finds by clear and
convincing evidence Athat the parent has engaged in conduct or knowingly
placed the child with persons who engaged in conduct which endangers the
physical or emotional well‑being of the child,@ and
that termination is in the best interest of the child under section
161.001(2).  Tex. Fam. Code Ann. ' 161.001(1)(E), (2).





[42]Victoria, a pharmacist, testified that Ambien is Anot a
medication that you would dispense to a woman in the latter stages of pregnancy
because of the excessive sleepiness it could cause the fetus.@  Drug abuse during pregnancy may constitute
conduct that endangers a child=s physical and emotional well‑being.  See U.P., 105 S.W.3d at 234.





[43]When questioned about whether she felt Robin bore some
responsibility for what happened to T.A.D., Beulah responded, AOn her
part, I would say negligence.@





[44]Victoria testified that Aanyone that is going to be taking care of [E.A.W.S.]
had better become accustomed to three or four hours of sleep and fit-throwing
and screaming.@  E.A.W.S. is
also a biter and a slapper.  Victoria
testified that E.A.W.S. shows anger by slapping and kicking and biting and that
it happens daily.  AShe has
good days that she doesn=t do it quite so much, but you never know what=s going
to provoke her to bite or to slap.@  With regard to
the biting, A[s]ometimes she=s going to go ahead and bite the person she=s going
after anyway, so even if you put her down, she=ll go back and bite them . . . she knows she wants to
go back and do what she wants to do.@





[45]Quam added that Victoria and her husband Areally
love [E.A.W.S.], but they love Robin too.@  Robin lived
with Victoria and her husband for several months after E.A.W.S. was born.





[46]Under rule 85, an Aanswer@ to a cause of action may consist of 

motions to transfer venue, pleas to the jurisdiction,
in abatement, or any other dilatory pleas; of special exceptions, of general
denial, and any defense by way of avoidance or estoppel, and it may present a
cross‑action, which to that extent will place defendant in the attitude
of a plaintiff.

 

Tex. R. Civ. P. 85.  AAnswers@ sufficient to stave off default judgment having
included a pauper=s affidavit, Hughes v. Habitat Apartments, 860
S.W.2d 872, 873 (Tex. 1993); a letter from a defendant corporation=s vice
president to the trial court clerk that includes the cause number and denies
liability, Custom‑Crete, Inc. v. K-Bar Servs., Inc., 82 S.W.3d
655, 657‑58 (Tex. App.CSan Antonio 2002, no pet.); and an unsigned letter
filed by a corporation that contains the sender=s address, denies liability, and contains the trial
court cause number, Home Sav. of Am. FSB v. Harris County Water Control
& Improvement Dist. No. 70, 928 S.W.2d 217, 218 (Tex. App.CHouston
[14th Dist.] 1996, no writ).  See also
Julia F. Pendery, Shawn M. McCaskill & Hilaree A. Casada, Dealing
with Default Judgments, 35 St. Mary=s L.J. 1, 23‑24 nn.90-100 (2003).

 

In Hock v. Salaices, the court observed that

 

[t]raditionally, any sort of appearance will defeat a
default.  Indeed, the courts have gone to
great lengths to excuse defects in answers to prevent the entry of default
judgments against parties who have made some attempt, albeit deficient,
unconventional, or flat out forbidden under the Rules of Civil Procedure, to
acknowledge that they have received notice of the lawsuit pending against them.

 

982 S.W.2d 591, 593 (Tex. App.CSan
Antonio 1998, no pet.) (distinguishing Aanswer@ for default judgment purposes from Aanswer@ for
summary judgment purposes).





[47]The record does not include any requests by the State
for a continuance  after David=s answer
was filed.





[48]In K.W., in his first letter, to TDPRS, the
father stated, AI Charles [W.] am the biological father of
[K.W.].  I am writing you and the courts
to inform you=s [sic] that I am not giving up my parental rights.@  138 S.W.3d at 429.  In his second letter, addressed to the court
coordinator and filed by the trial court, he recited, AI
Charles [W.] am the biological father of [K.W.] age 3 born 2‑13‑99,@ and
added that he wanted to inform all parties that he did not wish to abandon his
parental rights.  Id. 





[49]TDPRS is the former name of the Texas Department of
Family and Protective Services.





[50]712 Sherman Avenue, Neosho, Missouri.





[51]Victoria testified that David is her brother, that she
had contact with him during the course of the case, although she did not
elaborate on how often or what kind, that he supported her plan to adopt
E.A.W.S., and that his parental rights should be terminated.  Quam, the CASA worker, testified that she had
spoken with David by phone, that it would be in E.A.W.S.=s best
interests that his parental rights be terminated, and that he told her he would
like to have E.A.W.S. adopted by his sister and her husband.  Neither Victoria or Quam testified about
reunification between E.A.W.S. and David.

The remainder of testimony involving
David, other than by the CPS workers Stewart, Campbell, and Sweeney, came from
Robin, about how they met, how she followed him to Missouri, and a single
incident of domestic violence between them before she returned to Texas.





[52]There is nothing in the record to indicate that David
behaved uncooperatively with CPS.





[53]There was no finding by the trial court that David=s rights
should be terminated based on construction of his answer as a voluntary
relinquishment. 





[54]Section 263.405(i) provides:

The appellate court may not consider any issue that
was not specifically presented to the trial court in a timely filed statement
of the points on which the party intends to appeal or in a statement combined
with a motion for new trial.  For
purposes of this subsection, a claim that a judicial decision is contrary to
the evidence or that the evidence is factually or legally insufficient is not
sufficiently specific to preserve an issue for appeal.

Tex. Fam. Code
Ann. ' 263.405(I) (Vernon Supp. 2006).





[55]David does not challenge the portion of the trial
court=s judgment appointing the State as permanent managing
conservator of E.A.W.S., nor of the appointment of Victoria and her husband as
possessory conservators of E.A.W.S.